UNITED STATES, Appellee

v.

Keith M. TERRY, Staff Sergeant
U.S. Air Force, Appellant

No. 06-0314

Crim. App. No. 35801

United States Court of Appeals for the Armed Forces

Argued October 24, 2006

Decided January 29, 2007

BAKER, J., delivered the opinion of the Court, in which EFFRON, C.J., and ERDMANN, J., joined.

STUCKY and RYAN, JJ., did not participate.


Counsel


For Appellant:  Lieutenant Colonel Frank R. Levi (argued); Lieutenant Colonel Mark R. Strickland and Major Sandra K. Whittington (on brief).


For Appellee:  Captain Kimani R. Eason (argued); Colonel Gerald R. Bruce and Lieutenant Colonel Robert V. Combs (on brief).

Military Judge:  Barbara G. Brand


**THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.**

United States v. Terry, No. 06-0314/AF

Judge BAKER delivered the opinion of the Court.

Contrary to his pleas, Appellant was convicted by a general court-martial composed of officer members of disobeying a lawful no-contact order, and the rape of a female airman stationed at the base in violation of Articles 92 and 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 892, 920 (2000), respectively. The adjudged and approved sentence included a dishonorable discharge, confinement for eight years, forfeiture of all pay and allowances, reduction to grade E-1, and a reprimand. The United States Air Force Court of Criminal Appeals affirmed. United States v. Terry, No. ACM 35801, 2005 CCA LEXIS 420, at *9, 2006 WL 13166, at *4 (A.F. Ct. Crim. App. Dec. 6, 2005).

On Appellant's petition we granted review of the following two issues:

I.   WHETHER THE MILITARY JUDGE ABUSED HER DISCRETION
     IN DENYING TWO CHALLENGES FOR CAUSE.

II.  WHETHER THE MILITARY JUDGE ABUSED HER DISCRETION
     BY GIVING A CONSTRUCTIVE FORCE INSTRUCTION OVER
     OBJECTION.

Although we resolve the second issue adverse to Appellant, for the reasons that follow, we decide the first issue in his favor.

Appellant was tried by a court-martial consisting of two officers and three enlisted personnel. Two officer members,

2

Major (Maj) H and Captain (Capt) A, indicated during voir dire that they knew family or friends who had been the victims of sexual assaults. Appellant challenged both members for cause. The challenges were denied. We conclude that Maj H properly sat on Appellant's court-martial. Although Maj H's wife had been the victim of some form of sexual assault by a family member, the record reflects that Maj H and his wife had not discussed the incident for over five years. Moreover, his wife had reconciled with the family member responsible for the sexual assault, which had occurred ten to twenty years earlier.

In contrast, we conclude the military judge erred in not granting the challenge for cause against Capt A. Capt A's experience with rape was pronounced and distinct. A long time girlfriend, whom Capt A may have intended to marry, was raped and became pregnant. The experience caused the girlfriend to break off her relationship with Capt A. Further, the girlfriend named the child after Capt A, indicating the nature of the bond and the continuing feelings between the girlfriend and Capt A. We believe that most persons in Capt A's position would have difficulty sitting on a rape trial, even given the passage of six years. Further, an objective observer might well have doubts about the fairness of Appellant's court-martial panel. Applying the liberal grant mandate, the military judge erred in not eliminating such doubts from Appellant's court-martial at

the outset.  As we stated in United States v. Clay, the liberal grant mandate exists not just to protect an accused's right to a fair trial, but also to protect society's interest, including the interests of the Government and the victims of crime, in the prompt and final adjudication of criminal accusations.  __ M.J. __ (7) (C.A.A.F. 2007).  Where military judges consider implied bias and apply the liberal grant mandate on the record, deference is warranted.  United States v. Downing, 56 M.J. 419, 422 (C.A.A.F. 2002).

As this case illustrates, a prior connection to a crime similar to the one being tried before the court-martial is not per se disqualifying to a member's service.  Capt A's experience with rape is too distinct to pass the implied bias muster.  If there were additional factors that might have swayed the military judge's determination otherwise, these factors were not placed on the record and subjected to an implied bias analysis.

THE CONSTRUCTIVE FORCE INSTRUCTION

Background

The facts of the rape offense were set forth in the opinion of the court below:

> The appellant was a radiology technician working in the ultrasound department at the Offutt AFB hospital. In December 2002, he performed an ultrasound examination on Airman First Class (A1C) S to check for swelling in her right ovary.  During the examination, the appellant talked with A1C S and told her he was taking classes at a local university.  He asked if she

4

would help him with one of his classes by letting him take ultrasound photos of the veins in her arms.  She agreed to come into the hospital the next day, a Saturday, and help him with his study.

When she arrived at 1200 the radiology clinic was relatively deserted, although it was a reserve training weekend.  The appellant led her to the ultrasound examination room by a more circuitous route than they had taken the day before.  He began to examine her arms, but then told A1C S that he was having trouble seeing her veins.  He asked if he could examine the veins in her legs to see if he could get a better picture.  She agreed, and the appellant left the room while she removed her pants and donned a hospital gown.  The appellant returned and continued the examination.  When he reached her groin area, he told her the picture was fuzzy and asked if she would mind removing her panties.  She agreed.  The appellant left the room again and A1C S removed her panties.

When the appellant returned, he asked if he could take ultrasound pictures of her left ovary, because he needed pictures of female organs and already had pictures of her right ovary.  A1C S agreed and placed her feet in the stirrups of the examining table.  The appellant inserted an internal probe and continued the examination.  When A1C S complained of some discomfort, the appellant apologized and adjusted his examination technique.  Next, the appellant asked A1C S if she would mind turning over on her stomach.  She complied.

The appellant positioned himself between her legs and continued to manipulate the internal ultrasound probe. He then asked her if she had ever had sex with a black man.  She said that she had not.  He next asked if she had ever had a one-night stand.  She said, "no."  He asked if she ever wanted to have a one-night stand, and she said she wanted to know a person before she "did anything" with him.  Next he asked her what she would do if he had a condom.  A1C S heard a "crinkling sound" turned her head and saw the skin of the appellant's bare thighs.  Then she felt the appellant's penis penetrate her vagina.  At the same time, he pressed his hands on her back and grabbed her breast with his right hand.  He told her not to

> scream.  A1C S crawled away from him and got up.  She
> put her clothes on and before she left the appellant
> told her not to tell anyone what had happened.

Terry, 2005 CCA LEXIS 420, at *2-*4, 2006 WL 13166, at *1.

At trial, the victim testified, among other things, that at no time did she ever intend on having intimate contact with Appellant.  When asked why she did not leave the room she stated,

> I was just scared, and I felt like if I -- even if I
> would have done anything I couldn't have -- the room
> was so small and it's like I was trapped in-between
> the wall and the machine, and he was like in the way
> of my -- it's just so cramped in there, you can't help
> but feeling enclosed.

At the close of the evidence the defense objected when the military judge indicated that he would provide the members with an instruction on constructive force.  This objection was overruled, with the military judge concluding that there was some evidence that raised the issue that Appellant had threatened or intimidated the victim.  The following instruction, in relevant part, was then provided to the members:

> Where intimidation or threats of death or physical
> injury make resistance futile, it is said that
> constructive force has been applied, thus satisfying
> the requirement of force.  Hence, when the accused's
> actions and words or conduct, coupled with the
> surrounding circumstances, create a reasonable belief
> in the victim's mind that death or physical injury
> would be inflicted on her and that resistance would be
> futile, the act of sexual intercourse has been
> accomplished by force.

Analysis

Appellant, citing United States v. Simpson, 58 M.J. 368 (C.A.A.F. 2003), contends that an instruction on constructive force should not have been given because neither his superior rank, position of authority, or physical size were factors on the issue of consent or the lack thereof.  It is true that these factors were more at issue in Simpson.  However, we need not rely on the factors that might have been relevant in that case in resolving the issue in this case.  It has long been the law with respect to the offense of rape that "[w]here intimidation or threats of death or physical injury make resistance futile, it is said that 'constructive force' has been applied."  United States v. Palmer, 33 M.J. 7, 9 (C.M.A. 1991).  Further, constructive force "may consist of expressed or implied threats of bodily harm."  United States v. Hicks, 24 M.J. 3, 6 (C.M.A. 1987).  Generally, a military judge is granted considerable discretion in deciding which instructions to give.  United States v. Damatta-Olivera, 37 M.J. 474, 478 (C.M.A. 1993).  The military judge will generally instruct on matters that are "in issue."  "A matter is 'in issue' when some evidence, without regard to its source or credibility, has been admitted upon which members might rely if they chose."  Rule for Courts-Martial (R.C.M.) 920(e) Discussion.  The record in this case contains "some evidence" that Appellant intimidated the victim

7

into sexual intercourse without consent and that the victim's perception of this intimidation and her attendant fear were reasonable. Among other things, there was some evidence that Appellant, acting under the guise of an E-5 medical technician in order to gain the victim's trust for the purported test, lured the victim to an isolated part of the hospital at off-duty hours, that he told the victim "not to scream," and that the victim was "really scared." Thus, we discern no abuse of discretion on the part of the military judge.

THE CHALLENGES FOR CAUSE

Background

Appellant contends that the military judge erred in denying his challenges for cause against two members, Maj H and Capt A. In response to voir dire questioning by both the military judge and trial counsel, Maj H indicated that he had a "family member, friend, [or] acquaintance [who had] been the victim of . . . rape or sexual assault . . . ." The trial counsel pressed Maj H on the specifics and the following colloquy ensued:

> TC: You had also indicated in the response to one of the judge's questions [that you knew] some type of victim involved in a sex assault that's an acquaintance, family member, [or] otherwise, can you explain in a little more detail who that was and what that was about?
>
> [Maj H]: I don't know how to answer that. It was a family member and I'd rather not go into it in open court.
>
> TC: I understand that it's uncomfortable and difficult . . . . [but] it's important for both the government but also

8

for [the accused] to understand what kind of life experience you may have had that you bring to the table.

[Maj H]:  Sure.  It was my wife . . . .

TC:  Did this incident occur while she was your wife or before . . . ?

[Maj H]:  Oh no, it was before, it was her stepfather.

TC:  And this was before you ever knew her?

[Maj H]:  Oh, yeah.

TC:  Do you recall about how long ago it was?

[Maj H]:  She was still living at home so she must have been 16 or . . . maybe 18.

TC:  [H]ow long have you been married?

[Maj H]:  Ten years.

TC:  Has your wife talked to you in any detail about . . . this incident?

[Maj H]:  At one point, yes, but ages ago, but it's obviously part of her makeup and her mother's still married to her stepfather.

TC:  Okay, you say she talked to you about it just one time?

[Maj H]:  It probably would have been more than just one time . . . it hasn't come up in five years, but it's still part of who she is.

TC:  How long has it been since you . . . have discussed it?  Do you think it's been five years or more?

[Maj H]:  Oh, yes.

TC:  [Do] you have a sense that this [past abuse] affects her life?  Have there been times more recently when you've seen her act in a certain way and you thought . . . that [it] has to do with [her past assault]?

[Maj H]: No, no. In fact, she and her mother both do a form of Indian dance and her stepfather takes pictures and they all went to India together . . . she and her mother and stepfather.

TC: Was there ever a formal allegation made?

[Maj H]: No, she just left home.

TC: Do you know if your wife has ever disclosed this situation to anyone other than you?

[Maj H]: And her mother, no, probably not.

. . . .

TC: Knowing about the circumstance . . . do you think you have any . . . preconceptions about the issue of sex assault or rape or related offenses?

[Maj H]: No, no, I don't think so . . . .

TC: Do you think there's anything about having heard your wife tell you about this situation that would cause you to not be able to sit fairly and impartially in this case?

[Maj H]: No.

TC: Do you think that you'd be able to listen to all the evidence, even if it deals with testimony concerning a sexual assault, and receive and consider all the evidence?

[Maj H]: Yes.

TC: Do you have any doubt at all about whether you'd be able to hear that evidence and consider it and sit fairly and impartially?

[Maj H]: No.

TC: Do you think that you can apply any instructions . . . that the judge may give you concerning rape or sexual assault?

[Maj H]: Yes.

TC: Any doubt about that?

10

[Maj H]:  No.

Capt A indicated during initial questioning that he too had known someone who was a victim of some type of sexual assault. When asked to return to the courtroom for further questioning, Capt A indicated that he had known two victims of assault. He was asked about each:

TC:  Can you explain in a little more detail who [you knew who were victims] and what that involved?

    . . . .

[Capt A]:  [My] [h]igh school . . . girlfriend for six years . . . . [A] guy that was supposed to be a friend of the family raped her, and . . . it was her first time . . . having intercourse, and she . . . became pregnant.  And then later on another girlfriend [informed me that] before I met her, she was also raped . . . .

TC:  The first person you talked about, how long ago was it that this incident occurred?

[Capt A]:  This occurred in [19]96 I believe.

TC:  And you were boyfriend and girlfriend at the time?

[Capt A]:  We were on and off for around five, six years . . . .

    . . . .

[The rape happened] near the end of [the relationship].

TC:  How did you first come to find out about this incident?

[Capt A]:  [The victim had terminated our relationship] and she called me up . . . to tell me what had happened and the reason [she ended the relationship] . . . . [She told me that due] to the [rape and] pregnancy she felt guilty . . .

11

she felt she was unworthy of being with me and didn't want to have anything to do with me because of the incident.

. . . .

TC:  What was your reaction when she told you about what happened?

[Capt A]:  I was angry.  I was angry at the person that did it obviously. . . . [T]his was her first type of intercourse, she [had] wanted to wait until she was married so it kind of ruined something that she had saved for her wedding day . . . . So it got me angry and upset . . . . I tried to stay in her life, but she pushed me and my family away.

TC:  At the point that she told you about this . . . . did you see staying together in a relationship [with her]?

[Capt A]:  Yes, I did . . . . [Though] looking back . . . [I don't know if I meant it or not] . . . , I had mentioned to her sister . . . [that] "I'm going to marry your sister at some point."

TC:  What's your contact been like since [19]96?

[Capt A]:  Probably a year we kept in sort of contact. When she gave birth to the baby we kept in kind of close contact.  She actually named her son after me, that's how close we were . . . .

. . . .

I've been married since late [19]97, and out of respect for my wife I don't contact any of my old girlfriends.

TC:  How do you feel about that situation and that incident today as you sit here?

[Capt A]:  Every incident is different.  I view everything for what it's worth . . . . I'm impartial.

. . . .

TC:  Can you go ahead and tell me again about the other person that you knew that was raped?

[Capt A]:  I don't know [about] the incident, I don't know what happened, how she got raped, I have no clue.  I didn't get into details.  We dated for maybe a couple of months.

. . . .

[She was] more of an acquaintance, and she had mentioned that she had been raped . . . .

TC:  Previous to your relationship?

[Capt A]:  [Yes], well previous.

. . . .

TC:  [Is] there anything about either of those experiences that you think would cause you to not be able to sit fairly and impartially in this case?

[Capt A]:  No, Sir.

. . . .

TC:  Do you think you're going to be able to apply that impartially to the law as the military judge instructs you and reach an unbiased finding?

[Capt A]:  Yes, Sir.

TC:  Do you have any doubt whatsoever about that?

[Capt A]:  No, Sir.

Upon the conclusion of voir dire the defense counsel made four challenges for cause.  The military judge granted the challenges with respect to two other potential members, one who had "more than just a passing acquaintance" with the victim, and the other who worried that if he sat on the panel he would have flashbacks to the assault of his daughter, and stated only that

he could be impartial "right now" rather than for the duration of the trial process.

The military judge denied the challenge to Maj H stating that though he "was [initially] uncomfortable when answering the questions [about his wife's experiences with sexual abuse] . . . . as the questioning went on he was [more] forthright in answering . . . ."  The military judge also stated that Maj H indicated that he "had no predisposition . . . . [and] that he could be fair and impartial . . . ."

The military judge also denied the challenge to Capt A using similar reasoning, concluding that she saw no indication that Capt A had any feelings about rape "[that could not be] put aside" so that he could be impartial.  Appellant preserved the issue for appeal by subsequently using his peremptory challenge against another member, Colonel H.  See United States v. Leonard, 63 M.J. 398, 403 (C.A.A.F. 2006) (trial defense counsel not required to state that he would use a non-existent peremptory challenge against another member).

Appellant contends that the liberal grant mandate required the military judge to grant the challenges for cause for both Maj H and Capt A.  Appellant further argues that Maj H's and Capt A's experiences actually biased them and/or that their experiences presented an implied bias.  Appellant asserts that

14

since both should have been removed, their participation in the court-martial denied him a fair trial.

The Government argues, among other things, that both Maj H and Capt A affirmed that they could be fair, there were differences between the Appellant's case and the events described by the challenged members during voir dire, and there was a "significant time lapse" between the court-martial and the events discussed during voir dire. Further, Capt A "only dated the rape victims." Finally, "trial defense counsel declined to inquire into this area of their backgrounds when given the opportunity."

DISCUSSION

The impartiality of members is a core principle of the military justice system, and "the sine qua non for a fair court-martial." United States v. Wiesen, 56 M.J. 172, 174 (C.A.A.F. 2001) (citation and quotation marks omitted). Its importance is emphasized by the fact that the mandate for disinterested, evenhanded members is echoed across the central sources of military law: the Constitution, federal statutes, regulations and directives, and case law. Leonard, 63 M.J. at 399 (citations omitted); see also Downing, 56 M.J. at 421 (finding that "[a]s a matter of due process, an accused has a constitutional right, as well as a regulatory right, to a fair

15

and impartial court-martial panel") (citation and quotation marks omitted).

A military judge's determinations on the issue of member bias, actual or implied, are based on the "totality of the circumstances particular to [a] case." United States v. Strand, 59 M.J. 455, 456 (C.A.A.F. 2004). Such determinations are guided by this Court's longstanding and often-stated holding that challenges for cause are to be liberally granted. Clay, __ M.J. at __ (7); United States v. Moreno, 63 M.J. 129, 134 (C.A.A.F. 2006); United States v. Miles, 58 M.J. 192, 194 (C.A.A.F. 2003); United States v. Youngblood, 47 M.J. 338, 341 (C.A.A.F. 1997); United States v. White, 36 M.J. 284, 287 (C.M.A. 1993).

Actual and Implied Bias

The requirement for impartiality necessitates inquiry into both the actual bias and implied bias of potential members, with each type of bias distinct and reviewed under a different standard. Youngblood, 47 M.J. at 341.

"The test for actual bias is whether any bias 'is such that it will not yield to the evidence presented and the judge's instructions.'" United States v. Napoleon, 46 M.J. 279, 283 (C.A.A.F. 1997) (citation omitted). The existence of actual bias is a question of fact, and we consequently provide the military judge with significant latitude in determining whether

16

it is present in a prospective member.  United States v. Warden, 51 M.J. 78, 81 (C.A.A.F. 1999).  That the military judge, rather than the reviewing court, has been physically present during voir dire and watched the challenged member's demeanor makes the military judge specially situated in making this determination. Id.  (noting that actual bias is viewed "subjectively, 'through the eyes of the military judge or the court members'" (quoting Napoleon, 46 M.J. at 283)).

In analyzing implied bias, however, appellate courts provide less deference to the military judge.  Id.  Here, the military judge's privileged position at trial is less important because the test for implied bias is objective, and asks whether, in the eyes of the public, the challenged member's circumstances do injury to the "perception of appearance of fairness in the military justice system."  Moreno, 63 M.J. at 134 (citations omitted).  In considering this question, courts also consider whether "most people in the same position would be prejudiced [i.e. biased]."  Strand, 59 M.J. at 459 (citation and quotation marks omitted).  Consequently, "'issues of implied bias are reviewed under a standard less deferential than abuse of discretion but more deferential than de novo.'"  Id. at 458 (quoting Miles, 58 M.J. at 195).

United States v. Terry, No. 06-0314/AF

Was There Actual Bias on the Part of Maj H or Capt A?

In this case, Appellant claims that given Maj H's and Capt A's experiences with the crime of rape, it "was asking too much of them" to be truly impartial. In her denial of the challenges against both Maj H and Capt A, the military judge emphasized the importance of the demeanor of each member in making her decision. Regarding Maj H, the military judge emphasized that "having [had] the opportunity to personally observe" Maj H, she was confident based on his "forthright and honest" answers that he could be fair and impartial regardless of his wife's history with sexual abuse.

The military judge made a similar finding regarding Capt A, introducing her decision to deny the challenge by stressing that "each decision [on challenges for cause] is being made on an individual basis [based on my having] watch[ed] each individual talk." "[After] watching [Capt A] answer the questions," the military judge believed "he was very sincere, very forthright" and she did not see "a demeanor" that would impact his ability to "be fair and impartial."

That the military judge unambiguously based her findings on her personal examination of witness demeanor brings the decision in line with this Court's precedents. We have held that "mere declarations of impartiality [on behalf of potential members], are not sufficient by themselves to insure legal propriety."

18

United States v. Harris, 13 M.J. 288, 292 (C.M.A. 1982).
However, "[w]e . . . recognize that the military judge is in the best position to judge the sincerity and truthfulness of the challenged member's responses on voir dire." Youngblood, 47 M.J. at 341 (citing United States v. Daulton, 45 M.J. 212, 217 (C.A.A.F. 1996)); see also, Miles, 58 M.J. at 194-95 (holding that "a challenge for cause for actual bias . . . essentially [requires a determination] . . . of credibility").

This Court has frequently addressed the specific concern for the bias at issue here: the potential for actual bias stemming from a member's exposure to a crime similar to the one to be litigated before them. In our analyses of actual bias resulting from such contact we have been guided by two principles. First, the fact that a member was close to someone who had been a victim of a similar crime is not grounds for per se disqualification. United States v. Velez, 48 M.J. 220, 223-24 (C.A.A.F. 1998). Likewise, "[m]ere distaste for certain offenses is not automatically disqualifying." United States v. Schlamer, 52 M.J. 80, 92 (C.A.A.F. 1999) (citing United States v. Bannwarth, 36 M.J. 265, 268 (C.M.A. 1993)).

Second, regardless of a member's prior exposure to a crime, it is often possible for a member to rehabilitate himself before the military judge by honestly claiming that he would not be biased. Even in light of a member's extensive exposure to the

same sort of crime that the member is being asked to adjudge at court-martial, we have regularly found the absence of actual bias when the military judge reported that following voir dire she was satisfied with the honesty of the member and convinced that the member was neither "inflexible" nor resistant to the evidence or the military judge's instructions. See, e.g., United States v. Brown, 34 M.J. 105, 111 (C.M.A. 1992) (in a case dealing with a sodomy charge, the military judge appropriately denied the challenge against a member whose young son had been the victim of a homosexual assault after "evaluat[ing] and accept[ing] this prospective member's . . . disclaimer on the basis of a careful examination of this person's demeanor . . . .").

Despite this, and the fact that this Court has found members lack bias in cases in which members have themselves been victims of crimes, see, e.g., Daulton, 45 M.J. at 217; United States v. Lavender, 46 M.J. 485, 489 (C.A.A.F. 1997); United States v. Reichardt, 28 M.J. 113, 116 (C.M.A. 1989); United States v. Porter, 17 M.J. 377, 379-80 (C.M.A. 1984), we have found actual bias when members have been victims of similar, particularly violent or traumatic crimes, or if other unique circumstances pertained.

For instance, in United States v. Smart, this Court held that it was an abuse of discretion to deny a challenge for cause

of a member sitting on an armed robbery case.  21 M.J. 15, 20 (C.M.A. 1985).  The member had been subjected to robbery at knife-point on at least six occasions, and his father had been robbed at gunpoint, the same crime for which the accused was charged.  Id. at 17.  Despite the potential member's assurances to the military judge that he could be impartial, the distress of his repeated robbery and his father's assault led this Court to "disagree that this assertion sufficed to permit his inclusion on the panel."  Id. at 20.

In Miles, this Court found error in a case concerning wrongful use of cocaine.  58 M.J. at 195.  In Miles, the military judge erred when he denied a challenge of a member whose nephew had died due to complications associated with his mother's prenatal use of cocaine.  Id.  It was not just the member's exposure to this misfortune that was determinative, but that the trial counsel himself commented that the event had evidently been traumatic for the member, and that the member had recently written an article for the base newspaper -- due to be published four days after the court-martial was to convene -- recounting his nephew's story and admonishing readers not to use drugs.  Id.

Without similar exacerbating circumstances present in the stories of either Maj H or Capt A, and in light of the military judge's assessment of the members' demeanor and truthfulness

21

during voir dire, we conclude the military judge did not err in finding an absence of actual bias in both Maj H and Capt A. "Their answers disclaimed any bias or partiality, and we do not fault the military judge for finding that the members exhibited no actual bias." Youngblood, 47 M.J. at 342.

Possible Implied Bias on the Part of Either Member

There are a number of factors in Maj H's situation that tend to ameliorate his exposure to the crime, dispelling the appearance of implied bias. First, though an exact chronology is not clear from the record, the crime against Maj H's wife took place at least ten, and perhaps as many as twenty years, prior to the court-martial and, significantly, before Maj H even knew his wife. It was never reported to law enforcement, nor was it cause for his wife to receive any counseling. As a couple they had spoken about the event only a few times, and the subject had not been broached for at least five years.

Further, Maj H's mother-in-law remains married to the man who assaulted his wife, and it appears some measure of intra-family reconciliation has been made. Maj H reports that his wife and her stepfather participate in a dancing club together, and shortly before the court-martial, Maj H's wife, her mother, and her stepfather had even traveled abroad together.

Finally, taking the record of Maj H's voir dire as a whole, the military judge's interpretation of Maj H's initial

22

discomfort in speaking about his wife's abuse was justifiably described as emanating from his concern for his wife's reputation in the community, rather than any distress he personally suffered due to his wife's experiences.

Capt A's situation is different. He reported that he knew two people who were victims of rape. The first was a woman who he had "dated for a couple months . . . in college." Capt A reported that he was not particularly close with the victim, calling her "more of an acquaintance." She had been raped "well previous" to their relationship, and had provided Capt A with no details as to what happened. Capt A had "no clue" about the incident. It appears the impact on Capt A of this rape is attenuated, and we find no implied bias here.

In contrast, the impact on Capt A of the rape of a longstanding girlfriend is more significant, and that situation "offers facts of clarity and consequence on both sides of the implied bias equation." Strand, 59 M.J. at 459.

On the one hand, the rape occurred more than seven years before the court-martial and Capt A had not spoken with the victim for more than six years. Further, Capt A reported that his lack of contact with the victim during this time was not because of uneasiness with what had happened or because of some particularly powerful lingering emotional attachment. Rather, it was "out of respect for [his] wife," that he did not "contact

any of [his] old girlfriends." Moreover, Capt A described his relationship with the victim as "on and off" and at the time of the rape the relationship was "off." Indeed, the victim was not living in the same country as Capt A.

On the other hand, in regards to this rape, Capt A -- unlike his minimal awareness of the rape of his other girlfriend, or in apparent contrast to Maj H's sparse knowledge of his wife's assault -- was familiar with the details of the rape. He was aware of exactly when the crime occurred, the circumstances of who assaulted her, and how the rapist had managed to gain access to her. Further, Capt A was aware of specific aggravating circumstances of the attack, such as the fact that the rape was the victim's first sexual experience, that the victim had wished to save herself for marriage, and that the rape resulted in a pregnancy and a child.

Capt A's connection to this victim and this crime appear noteworthy and lasting even after their relationship ended. When asked how he felt about the incident by the trial counsel, Capt A expressed that he was incensed, and whether or not their relationship was ongoing at the time of the incident, he was angry that his "very close friend" had been hurt. Though it is not clear whether Capt A still harbored these feelings or was merely recounting his past emotions to the court, it is likely that given the strength of his relationship with the victim he

24

may well have maintained this resentment. In fact, Capt A had been close enough to the victim and her family to have been made a part of her sister's wedding party. It was at the wedding that Capt A informed the victim's sister that he was going to marry the victim "at some point." Finally, Capt A reported that the rape was the reason that the victim broke up with him and that following the assault the victim was wracked by feelings that "she was unworthy" and she did not want to be with Capt A "because of the incident." Despite this, they kept in close contact through the birth of the victim's son; indeed, Capt A reported that they were so close that the victim named her son after him. Capt A "tried to stay in her life, but [the victim] pushed [him and his] family away."

Though the military judge was correct in basing her finding of a lack of actual bias on her impressions of Capt A's demeanor and statements during voir dire, the record does not reflect the application of an objective implied bias test. Indeed, there was no indication that the military judge "intended to address implied bias at all." Downing, 56 M.J. at 422.

This Court recognizes that "[t]he military judge may well have intellectually applied the . . . test. However, the law is clear in this area . . . . We do not expect record dissertations but, rather, a clear signal that the military judge applied the right law." Id.

25

Such an examination would have explicitly brought the distinct features of Capt A's situation to bear and would have compelled the military judge to "squarely address the essential question [of an implied bias analysis] -- was [she] satisfied that an objective public observer would find [Capt A's service on the panel notwithstanding his acute involvement with the crime of rape as] consonant with a fair and impartial system of military justice?" Id.

As previously stated, a prior experience with or connection to the crime in question is not per se disqualifying, as the circumstances involving Maj H demonstrate. However, the events described by Capt A go well beyond the circumstances described by Maj H. We have no reason to doubt the military judge's determination that Capt A was capable of compartmenting his life history and impartially hearing Appellant's case. However, applying the liberal grant mandate and cognizant of case law finding "implied bias 'when most people in the same position would be prejudiced,'" Wiesen, 56 M.J. at 174 (citations omitted), we hold that the military judge erred in denying the challenge for cause as to Capt A.

Whatever Capt A's individual character and emotional capacity, we believe most people in Capt A's circumstance would be hard pressed with such a background to sit impartially in a rape case. The totality of circumstances in this case include

the circumstances in which Capt A's relationship with his longtime girlfriend ended, the suggestion that Capt A would otherwise have married this girlfriend, and the subsequent choice of the girlfriend to name the resulting child after Capt A.  In such circumstances, it "was 'asking too much' of him and the system" for Capt A to sit.[*]  See Miles, 58 M.J. at 195 (citations omitted); Daulton, 45 M.J. at 218 (citation omitted).

### DECISION

The decision of the United States Air Force Court of Criminal Appeals is reversed and the findings and sentence are set aside.  The record of trial is returned to the Judge Advocate General of the Air Force.  A rehearing may be authorized.

---

[*] "Although military or national security exigencies may create personnel circumstances relevant to the liberal grant analysis, there is no indication in the record that this was the reason for the military judge's denial of Appellant's challenge for cause."  Clay, __ M.J. at __ (11, n.2).