# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
YOB, KRAUSS, and BORGERDING[1]
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Sergeant ARMANDO R. BACA**
**United States Army, Appellant**

ARMY 20100396

Headquarters, III Corps and Fort Hood
Gregory Gross, Military Judge
Colonel Stuart W. Risch, Staff Judge Advocate

For Appellant:  Lieutenant Colonel Peter Kageleiry, JA (argued); Lieutenant Colonel Jonathan F. Potter, JA; Lieutenant Colonel Peter Kageleiry, JA (on brief); Lieutenant Colonel Peter Kageleiry, JA (on reply brief).

For Appellee: Captain T. Campbell Warner, JA (argued); Lieutenant Colonel Amber J. Roach, JA; Major Daniel D. Maurer, JA; Captain T. Campbell Warner, JA (on brief).

22 August 2013

----------------------------------
MEMORANDUM OPINION
----------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

YOB, Senior Judge:

A general court-martial composed of enlisted members convicted appellant, contrary to his pleas, of one specification each of unpremeditated murder, violating a lawful general regulation, and communicating a threat, in violation of Articles 92, 118, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 892, 918, 934 (2006) [hereinafter UCMJ].  The panel sentenced appellant to a bad-conduct discharge, confinement for twenty years, forfeiture of all pay and allowances, and reduction to

---
[1] Judge BORGERDING took final action on this case while on active duty.

the grade of E-1. The convening authority credited appellant with 296 days of confinement against the sentence to confinement, and approved the remainder of the adjudged sentence.

This case is before this court for review under Article 66, UCMJ. Appellant raises three assignments of error, none of which have merit, separately addressed below.

**FACTS**

On the evening of 17–18 July 2009, appellant attended a party at Specialist (SPC) JE's home on Fort Hood. In attendance that night were several soldiers who served together in Iraq, including SPC RS and SPC GO. Most of the attendees, including appellant, consumed a significant amount of alcohol.

Late in the evening, an intoxicated appellant and SPC GO got into an argument which escalated into appellant forcefully pushing SPC GO against a wall. The two separated, appellant went to the back yard, and SPC GO moved to the front of the house with several other soldiers. A few minutes later, appellant went to his vehicle, reached into the passenger compartment, and returned to the front yard with a pistol in hand. Appellant charged the weapon twice and leveled it at SPC GO. Seeing the weapon, SPC RS pushed SPC GO aside and shouted, "[W]atch out." Appellant fired his weapon, the round striking SPC RS in the hip. SPC RS died a few minutes later in the front yard as a result of the gunshot wound.

Immediately after appellant shot SPC RS, SPC GO took the weapon away from appellant and gave it to another soldier. Appellant did not seem upset after the shooting nor did he immediately appear to realize that he shot SPC RS. When the other soldiers told appellant that he shot SPC RS, appellant asked, "I shot [SPC RS]?" and said to SPC RS as he lay bleeding on the ground, "You're not hit, get up you fucking pussy, you ain't hit bad." Appellant then went into the house, retrieved his weapon and waived it about while threatening to kill others. He then went to his car and drove away. Appellant threw the pistol from the car less than a mile from the scene, where it was later found by a police officer responding to the shooting.

According to appellant's roommate, as soon as appellant returned to his house the next morning, he asked if the police were there. Appellant stated he accidently shot someone and was extremely upset. Appellant then received a phone call and learned that SPC RS did indeed die from the gunshot wound. After considering his options, appellant turned himself in to military law enforcement later that morning. The government charged appellant with, *inter alia*, premeditated murder of SPC RS under Article 118, UCMJ.

A panel of two officers and four enlisted members, including Sergeant Major (SGM) JH and Major (MAJ) VC, sat for appellant's court-martial. During individual voir dire by defense counsel, both SGM JH and MAJ VC stated that they had family members who had been shot to death. SGM JH stated that his first wife was shot and killed during a convenience store robbery approximately twenty-two years prior. Major VC indicated that six years prior, one of her cousins goaded his brother into a "Russian-roulette type of thing" which resulted in the brother's death. Major VC also explained that she was very close to both cousins.

After individual voir dire, the military judge engaged in the following discussion with SGM JH:

> Q: Sergeant Major, considering what happened to your first wife 22 years ago, do you think that will play any part in your serving as a panel member in this case?
>
> A: I don't think so, sir. I mean, it's - - - you never forget something like that, but - - - I mean, I think about it, but it really doesn't influence my judgment on different things. I think I've been in the Army long enough and seen and heard of other people overcoming stuff, so I don't think it will.

The military judge denied appellant's challenge for cause based on implied bias, ruling:

> MJ: [SGM JH] also stated that he's been in the Army long enough to know that you overcome things and drive on. He said that, sure, human nature is that he's going to think about it, that it's already caused him to think about it, probably because he was specifically asked, but he did indicate that that would have no effect on him whatsoever in this case. Even considering the liberal grant mandate, the defense's challenge of [SGM JH] is denied.

At the conclusion of individual voir dire, the military judge had the following exchange with MAJ VC:

> Q: [MAJ VC], the experience you had with your cousins, do you think that is going to affect your impartiality at all in this case?
>
> A: At this point, I don't believe so.

Q: Okay. Do you think that you're going to be able to separate this case from your cousins' case - - - -

A: Yes.

Q: - - - and decide this case solely on what you hear in this courtroom and the instructions that I give you?

A: Yes, sir.

The military judge also denied appellant's implied bias challenge for cause against MAJ VC. In response to the defense challenge for cause, the trial counsel stated:

MJ: [MAJ VC] said that she can separate what happened with her cousins from this case. She said that she was geographically well-separated from her cousins when that incident happened. She didn't attend the trial. She still speaks regularly with the person who - - - the remaining cousin, the one who lived, who actually was responsible. Again, she said that she can actually separate it and it won't affect her in any way in this case. So the government feels that even with the liberal grant mandate, there is no appearance of bias in this case . . . .

In response to the challenge and trial counsel's argument, the military judge then stated, "Even considering the liberal grant mandate, I agree with everything the trial counsel just stated" and subsequently denied appellant's challenge.

During the merits case, the crux of defense counsel's strategy addressed appellant's state of mind at the time of the shooting. In sum, the defense theory of the case was that appellant lacked mental responsibility for shooting SPC RS because appellant thought he was at a checkpoint in Iraq. To support their theory, the defense called as an expert witness Dr. Jonathan Dowben, a board certified forensic psychologist who conducted appellant's Rule for Courts-Martial [hereinafter R.C.M.] 706 inquiry. Dr. Dowben testified that he diagnosed appellant with "alcohol intoxication, alcohol dependent, adjustment disorder with mixed disturbance of emotions and conduct, and nicotine dependents [sic]." According to Dr. Dowben, appellant's alcohol intoxication and alcohol dependence were the etiologic or causal factors amounting to severe mental disease or defect which caused appellant to not know what he was doing at the time of the shooting. According to Dr. Dowben's professional opinion, appellant did not have the ability to understand the nature and quality, or wrongfulness of his actions as a result of appellant's severe mental disease or defect.

BACA—ARMY 20100396

The defense also called Dr. Stacey Rexrode, who was appellant's treating psychologist, as an expert witness. Dr. Rexrode diagnosed appellant with post-traumatic stress disorder [hereinafter PTSD] and testified that in her professional opinion appellant was suffering from PTSD at the time of the shooting. However, Dr. Rexrode was unable to cite any specific traumatic events appellant experienced that would have resulted in him suffering from this condition. Contrary to Dr. Rexrode, Dr. Dowben did not diagnose appellant with PTSD because appellant did not exhibit severe enough symptoms to warrant such a diagnosis.

To rebut Dr. Dowben's testimony, the government called Dr. Matthew Soulier as an expert in general and forensic psychiatry. Dr. Soulier testified that in his expert opinion, appellant did not suffer from a severe mental disease or defect at the time of the shooting and was able to appreciate the nature and quality, or wrongfulness of his actions. Dr. Soulier diagnosed appellant with "alcohol dependence in a controlled environment," "depressive disorder not otherwise specified, in full remission," and malingering.

The malingering diagnosis was one of the primary bases of Dr. Soulier's opinion that appellant did not suffer from a severe disease or mental defect. At the outset of his testimony, Dr. Soulier explained that "malingering . . . is considered a core competency in forensic psychiatry," and that he had received training in the assessment and detection of malingering.[2]

Defense counsel objected several times to Dr. Soulier's testimony. The first objection occurred when Dr. Soulier testified that he was "startled" when appellant told him that he regretted throwing out his gun.

> Q: What was your reaction to Specialist Baca saying this?
>
> A: I was startled. I was honestly startled. Again, in my experience, when it comes to trying to detect whether someone is telling is telling me the whole truth, no one's ever gonna come out and tell me, "oh, I'm lying to you"; no one ever says that. What you have to rely on when you're trying to detect whether someone is telling you the whole truth – – – –

---

[2] Malingering is defined as "the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as avoiding military duty, avoiding work, obtaining financial compensation, evading criminal prosecution, or evading drugs." THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, § V65.2 (Am. Psychiatric Ass'n 4th ed.) (1994).

5

> CDC: Objection – – – –
>
> A: – – – – is one – – – –
>
> CDC: Objection, Your Honor.
>
> MJ: What's the basis?
>
> CDC: He's trying to act as a human lie detector.
>
> MJ: Sustained.
>
> Q: Doctor Soulier, why don't you cast it in terms of malingering, the forensic term?

The next defense objection occurred when Dr. Soulier described the testing of malingered memory he performed on appellant and the resulting scores.

> Q: What do these scores indicate in your professional opinion?
>
> A: In my opinion and in my experience, this is suggestive of malingering – – – –
>
> CDC: Objection, Your Honor. It's just a round-about way of getting back to the original objection we have. He's trying to be a human lie detector with these – – these test [sic]; it should be stricken.
>
> MJ: Doctor Soulier, did you mean that it was your opinion that he was malingering on these test [sic]?
>
> WIT: That's correct.
>
> MJ: Overruled.

The third objection occurred as Dr. Soulier discussed appellant's performance on the Structured Inventory of Malingered Symptology [hereinafter SIMS] test, which is a validated test for malingering. Previously, Dr. Soulier stressed that appellant's SIMS score was suggestive of malingering but was not by any means definitive. However, defense counsel objected when Dr. Soulier gave his conclusion based on the test results:

> Q: So what did you conclude from this result?

6

A: Just that, again, it's just one more data point – – when I'm trying to decide whether a particular defendant or accused is malingering their presentation, I'm looking for a convergence of data that are going to either come down on saying yes, the person is attempting to tell the truth, or no – – – –

CDC: Objection, Your Honor – – – –

A: – – – – a person is not exactly saying the whole truth.

CDC: Objection. He has just stated exactly the basis for the earlier objection.

MJ: Sustained. Panel members, only you can determine – – or you can determine the credibility of any witnesses that testify here, and the credibility of any evidence that you have heard. It's improper for another witness to give an opinion on what they believe is a lie; what they believe is truth. So I'm instructing you to disregard that testimony if you took it that way.

The members indicated that they would agree to follow the military judge's curative instruction.

Dr. Soulier also testified in his opinion that appellant met the criteria for alcohol dependence, alcohol intoxication, and substance induced mood disorder. However, the military judge sustained defense counsel objection when Dr. Soulier testified, "[b]y drinking voluntarily, you knowingly take upon yourself consequences[.]"

Defense counsel also objected when Dr. Soulier testified about the differences between California law and military law as it related to what constitutes severe mental illness. Specifically, Dr. Soulier testified that, "[In California], you cannot be found criminally irresponsible for a crime solely on the basis of alcohol dependence or an adjustment disorder; the two diagnoses that Doctor Dowden [sic] gave him. Now in the military, in this jurisdiction, it's not that way." The civilian defense counsel objected on the basis that Dr. Soulier was "substituting the legal instruction to a competent board." The military judge sustained civilian defense counsel's objection.

Defense counsel asked the military judge to declare a mistrial citing Dr. Soulier's repeated "human lie-detector' testimony and Military Rule of Evidence 403. Defense counsel argued that a curative instruction could not cure the prejudice

7

because Dr. Soulier made three comments regarding appellant's credibility which infiltrated the ultimate power of the panel to say who is telling the truth and who is not, leading the panel to conclude that the presented defense "would never fly" in California.

The military judge, noting that he had already sustained multiple defense objections to Dr. Soulier's testimony and had previously instructed the panel members, denied the motion for mistrial:

> MJ: Okay.
>
> The motion for mistrial is denied.
>
> I instructed the panel already and they are to determine the credibility of witnesses and to determine what other evidence is false or not false. I will instruct them again, I will give them – – I already planned on this, even before, so I'm going to give them a limiting instruction regarding Doctor Soulier's testimony, and that he was only called to rebut Doctor Dowben's testimony that the accused was suffering from a severe mental disease or defect, and he was unable to appreciate the nature and quality and wrongfulness of his actions.

Lastly, after the military judge denied the motion for mistrial, Dr. Soulier summed up the basis of his opinion that appellant did appreciate the wrongfulness of his conduct at the time of the shooting.

> Q: On – – on what do you base that opinion?
>
> A: On multiple – – again, the evidences [sic].
>
> First of all, after he allegedly shoots [SPC RS], he retrieves the alleged murder weapon himself, and then he flees. He doesn't stay, he doesn't call 911 himself, he doesn't attend to his friend, he flees with the murder weapon in hand, gets in the car, and allegedly throws the gun 0.8 miles from the scene of the crime. To me, in my opinion, that was evidence of a man attempting to evade justice. A man – –

Again, civilian defense counsel objected to Dr. Soulier's testimony which the military judge sustained. Here too, the military judge instructed the panel members to disregard Dr. Soulier's last comment.

Before sending the panel to deliberate, the military judge once more instructed the panel "[t]o the extent that you believed that Doctor Soulier . . . testified or implied that they believe or disbelieve any other witness, evidence, or defense, or that a crime was committed, then you may not consider this as evidence that a crime occurred or that other evidence or a defense is credible or incredible." At the end of trial, the members found appellant not guilty of premeditated murder but guilty of the lesser-included offense of unpremeditated murder.

**DISCUSSION**

*A. Military Judge's Refusal to Grant the Defense Motion for Mistrial*

An expert may give testimony, in the form of an opinion, on the issue of whether the accused was able to appreciate the nature and quality or the wrongfulness of the acts in question due to a severe mental disease or defect. *United States v. Combs*, 39 M.J. 288, 291–92 (C.M.A. 1994); Military Rule of Evidence [hereinafter Mil. R. Evid.] 703 & 704; Art 50a, UCMJ. An expert witness may also give opinion testimony on the issue of whether an accused is malingering or feigning symptoms to avoid prosecution. *See Cooper v. Oklahoma*, 517 U.S. 348, 364–65 & n.21 (1996). However, an expert witness may not opine concerning the guilt or innocence of the accused or the credibility of the accused or an affirmative defense, for those ultimate issues are solely for the trier of fact. *See United States v. Diaz*, 59 M.J. 79, 89–90 (C.A.A.F. 2003).

In general, a curative instruction by the military judge is preferable to declaring a mistrial. *Diaz*, 59 M.J. at 92. Our higher court has "often held that a curative instruction can render an error harmless." *Id.* (quoting *United States v. Armstrong*, 53 M.J. 76, 82 (C.A.A.F. 2000)). *See also United States v. Balanga*, 33 M.J. 54, 56–57 (C.M.A. 1991). However, it must be clear on the record that the members not only understand the curative instruction but that they will also adhere to the military judge's curative instruction as well. *See Diaz*, 59 M.J. at 92.

A military judge's decision to grant or deny a motion for mistrial shall not be reversed "absent clear evidence of an abuse of discretion." *United States v. Ashby*, 68 M.J. 108, 122 (C.A.A.F. 2009) (citation omitted); R.C.M. 915(a). Subject to the military judge's discretion and considerable latitude, a mistrial may be declared when it is manifestly necessary in the interests of justice due to circumstances which cast substantial doubt upon the fairness or impartiality of the proceedings. R.C.M. 915(a); *United States v. Seward*, 49 M.J. 369, 371 (C.A.A.F. 1998). A mistrial is generally considered an unusual and disfavored remedy that should only be applied in extraordinary circumstances and as a last resort to protect the guarantee of a free trial. *Diaz*, 59 M.J. at 90.

Appellant cites at least seven instances in which he alleges Dr. Soulier provided improper testimony. We need not address those instances cited that failed to prompt any defense objection at trial. Nothing in this testimony, presented without objection, required the military judge to act sua sponte to exclude the testimony or required any specific curative instructions. In one other instance, appellant notes that the military judge denied a defense objection to testimony in which this expert described some of the factual basis that informed his opinion. We conclude the military judge did not err in allowing this testimony.

Appellant's argument in favor of a mistrial mainly centers on those few instances noted above where panel members were exposed to improper testimony from Dr. Soulier and the military judge sustained defense objections to this testimony. In sustaining one of the objections, the military judge instructed the panel members to disregard the improper testimony, and in another instance, the military judge gave an immediate curative instruction informing the members that only they can determine the credibility of witnesses, and to disregard any testimony in which the witness gives an opinion as to this issue. The panel members all provided an affirmative response to the curative instruction when asked by the military judge if they agreed.

Not only did the military judge provide a curative instruction immediately following his sustained objections, the military judge also provided standard instructions both preliminarily and in conclusion to the presentation of evidence concerning the members' role in determining the credibility of witnesses. Given the sustained objections to the improper testimony and the instructions given, including the curative instruction during testimony, we find the military judge's decision to deny the motion for a mistrial was not an abuse of discretion. In reaching this conclusion, we have considered the entire record, and are satisfied that any error associated with the member's exposure to Dr. Soulier's testimony did not contribute to appellant's conviction or sentence. *See Diaz*, 59 M.J. at 93; *Balagna*, 33 M.J. at 57.

## B. *Military Judge's Denial of Defense Challenges Against Two Members*

Military judges are enjoined to liberally grant an accused's challenges for cause. *United States v. Clay*, 64 M.J. 274, 277 (C.A.A.F. 2007). Challenges may be based on actual or implied bias. The test of actual bias is whether the bias "is such that it will not yield to the evidence presented and the judge's instructions." *United States v. Wiesen*, 56 M.J. 172, 174 (C.A.A.F. 2001) (internal citation & quotation marks omitted). The focus of implied bias is "the perception or appearance of fairness in the military justice system." *Id.* (quoting *United States v. Dale*, 42 M.J. 384, 386 (C.A.A.F. 1995)). Implied bias exists when "most people in the same position would be prejudiced." *Id.* (citation omitted). When there is no actual bias,

"implied bias should be invoked rarely." *Id.* (quoting *United States v. Rome*, 47 MJ. 467, 469 (C.A.A.F. 1998)).

We review challenges for cause based on implied bias under a standard less deferential than abuse of discretion, but more deferential than de novo review. *United States v. Bagstad*, 68 M.J. 460, 462 (C.A.A.F. 2010). Where military judges consider implied bias and apply the liberal grant mandate on the record, deference is warranted. *United States v. Terry*, 64 M.J. 295, 297 (C.A.A.F. 2007).

A prior connection to a crime similar to the one being tried before the court-martial is not per se disqualifying to a member's service. *Terry*, 64 M.J. at 297. Courts must look at the member's experience with the crime to determine whether it is "too distinct" to pass the implied bias analysis. *Id.* Here, the group voir dire merely established that the members in question had relatives who were killed by firearms. Individual voir dire failed to establish a distinct connection between the members' experiences and the present case. Questions by the defense counsel of these members were not extensive, briefly touching on the circumstances of the loss of their family members and not delving at all into the short or long term impact of these deaths on the members.

Defense counsel's questioning of SGM JH revealed merely that twenty-two years ago his first wife was killed with a firearm when she was working in a convenience store. The perpetrator was eventually identified, convicted, and sentenced to a lengthy term of confinement. Counsel did not pursue any additional questions about possible linkage in the mind of the member between that case and appellant's. Based on these answers, the member's indication that this incident did not influence his judgment in general and that the member did not think it would affect his opinion in this case, the military judge denied the challenge for cause. When the military judge stated the record did not reflect grounds for challenge for actual or implied bias, defense counsel made no request or effort to develop the record further to support the challenge. In cases such as these, additional factors that might sway a judge's decision to grant a challenge for cause should be placed on the record by counsel and subjected to an implied bias analysis. *Terry*, 64 M.J. at 297. It is incumbent on counsel to develop the record to support their challenge.

Likewise, the individual voir dire of MAJ VC touched briefly on her knowledge of the death of her cousin, six years prior, from a self-inflicted gun-shot wound. Questioning revealed only that she was aware the deceased's brother, who was also her cousin, was found responsible for the death and received probation. There were no questions further addressing the circumstances of the events, the impact of the death on the member, or any effect this death could have on her perception of appellant's case. Ultimately, MAJ VC told the military judge she didn't think the incident would have an impact on her impartiality "at this time" and that she could separate her cousin's case from appellant's. Defense counsel made no

further effort to develop any basis for an implied bias challenge. Therefore, the record before us provides no sufficient basis to disturb the military judge's denial of the challenges against SGM JH and MAJ VC, for either actual or implied bias, in light of the deference afforded to the military judge under the circumstances.

### *C. Failure to Allege the Article 134, UCMJ, Terminal Element*

Appellant asserts that the government failed to allege the terminal element under Article 134, UCMJ relative to the Specification of Charge III, communicating a threat, and argues that the specification should be dismissed in accordance with the holding of *United States v. Fosler,* 70 M.J. 225 (C.A.A.F. 2011) and *United States v. Humphries*, 71 M.J. 209 (C.A.A.F. 2012). However, in view of *United States v. Gaskins*, 72 M.J. 225 (C.A.A.F. 2013), *United States v. Goings*, 72 M.J. 202 (C.A.A.F. 2013), and *United States v. Tunstall*, 72 M.J. 191 (C.A.A.F. 2013), we conclude that notice of the missing element is extant in the record. *See Humphries*, 71 M.J. at 215-16.

During voir dire, trial counsel told the panel members:

> Members, Specialist Baca is charged with violating a lawful general regulation, communicating a threat, and premeditated murder. The violation of the regulation and the communicating a threat Specifications require the government to prove that Specialist Baca's conduct was "to the prejudice of good order and discipline in the Armed Forces or was of a nature to bring discredit upon the Armed Forces." The military judge, at the end of the case will give you several instructions; one of the instructions will regard this requirement.

At the end of the government's merits case, defense counsel moved for a finding of not guilty under R.C.M. 917. Defense counsel contended that appellant was "not aware of any evidence that was offered under the element of whether or not the communicating a threat was prejudicial to good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces[.]" The military judge properly denied the R.C.M. 917 motion.

We find that the clear and unambiguous reference to the terminal element, coupled with defense counsel's R.C.M. 917 motion, sufficiently show that appellant had notice of the terminal element. The government's direct reference to the terminal element in open court referenced not only the element itself but also the government's burden to prove the existence of either terminal element beyond a reasonable doubt. Under these circumstances, appellant had sufficient notice of the missing element.

**CONCLUSION**

The findings of guilty and the sentence are AFFIRMED.

Judge KRAUSS and Judge BORGERDING concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court