# UNITED STATES NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS

————————————

## No. 201500270

————————————

### UNITED STATES OF AMERICA
Appellee

v.

### MATTHEW R. BELTRAN
Chief Aviation Electrician's Mate (E-7), U.S. Navy
Appellant

————————————

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge: Captain Andrew H. Henderson, JAGC, USN.
Convening Authority: Commander, Navy Region Northwest,
Silverdale, Washington.
Staff Judge Advocate's Recommendation: Commander Edward K.
Westbrook, JAGC, USN.
For Appellant: Lieutenant Jacqueline M. Leonard, JAGC, USN.
For Appellee: Lieutenant Jetti L. Gibson, JAGC, USN; Lieutenant
James M. Belforti, JAGC, USN.

————————————

Decided 14 February 2017

————————————

Before CAMPBELL, GLASER-ALLEN, and HUTCHISON, *Appellate
Military Judges*

————————————

**This opinion does not serve as binding precedent, but may be cited
as persuasive authority under NMCCA Rule of Practice and
Procedure 18.2.**

————————————

CAMPBELL, Senior Judge:

At a contested general court-martial, officer members convicted the
appellant of an attempted lewd act upon a child over 12 but under 16 years
old, and attempted sexual acts upon a child over 12 but under 16 years old,
violations of Article 80, Uniform Code of Military Justice (UCMJ), 10 U.S.C.

§ 880 (2012). After the members' findings were announced, the military judge conditionally dismissed the first specification and merged it with the second specification.[1] The convening authority approved the adjudged sentence of five years' confinement, forfeiture of all pay and allowances, and mandatory dishonorable discharge.

In four assignments of error, the appellant contends there is legally and factually insufficient evidence to support the conviction, the military judge abused his discretion in denying the challenge for cause against a court-martial member, the punishment is too severe, and the court-martial order (CMO) does not accurately reflect the conditional dismissal and merger of specifications. Having carefully considered the record of trial and the parties' submissions, we conclude the findings and sentence are correct in law and fact and find no error materially prejudicial to the appellant's substantial rights. Arts. 59(a) and 66(c), UCMJ. We order corrective action to accurately reflect the findings in the supplemental CMO.

## I. BACKGROUND

### A. Civilian law enforcement cyber operation

In *Craigslist's* casual encounters section for the Skagit County, Washington, region, the appellant attempted to meet young women by describing himself as a 35-year-old man looking to give a "no-strings-attached" massage:[2]

> Any young lady wanting a nsa massage? – m4w – 35 Skagit/Island
>
> I travel and host. Is there any young lady out there interested in a massage? Could be a onetime never see you again or on going. I'm good-looking, sane, clean and disease free. We can meet first so you can see the truth. Satisfying you satisfys me. No obligation to go any further than massage. Have pic but you first. Looking for 18-29, skinny and pretty. You know you want a massage. I guarantee you won't be disappointed. Lets give it a try.[3]

Conducting an undercover law enforcement operation, a Skagit County Sheriff's Office crimes against children investigator, Detective L, responded

---

[1] This reduced the maximum confinement punishment from 35 to 20 years.

[2] The typographical and grammatical errors within the appellant's *Craigslist* ad and email correspondence to "Taylor" are largely quoted in their unedited, original form.

[3] Record at 224-27; Defense Exhibit C.

to the advertisement—posing as a minor with a complete on-line profile of a local, 14-year-old girl named Taylor Pender.

During their 23 September 2014 email correspondence, the appellant sent sexually explicit messages before and after Detective L's on-line persona repeatedly explained she was only 14. Their messages discussed oral sex; how Taylor felt "[g]uys [her] age have no skills" and she has been wanting to have sex with "an older guy"; that he could come to her house since her "mom isn't home [until] late tonight"; and that she was "almost 15" but able to "date guys who are much older [than her] who never know the difference"; that she attended school on-line; and was prepared to meet him at a local park.[4] More than 90 minutes into their discussion, Taylor interjected payment for her services by asking if the appellant would give her "a little donation[.]"[5] Following price negotiations, she declined to meet the appellant that day due to his lack of cash, but agreed to meet the next day, saying the sex would be so great that he would "forget all about [her] age like all the others do."[6]

Having driven to the park during their discussions, the appellant attempted to reopen negotiations, but Taylor explained she had another guy "on the hook for some cash" and declined to meet until the following day.[7] Detective L testified that she emailed Taylor's unwillingness to meet on 23 September only when she became unable to participate further that afternoon. Consequently, neither Detective L nor an arrest team went to Hillcrest Park, the operation's designated arrest site, despite the appellant's indication that he was already there to meet Taylor. Surveillance video footage that the government presented at trial confirmed the appellant drove and walked around the park on 23 September.

Messaging with Taylor resumed the next morning and included similar discussions of services, prices, and a meeting location. The appellant expressed only one concern about their meeting:

> I have one request. Before I go into your house I want to do something that will prove to me you are not a cop or something. Yesterday I was [at] the bathrooms next the [tennis] court and noticed they were empty. If I go in and make sure its empty would you follow and flash or touch my c[***?] Anything to let

---

[4] Prosecution Exhibit 2 at 1.

[5] *Id.* at 2. Detective L testified that Taylor's request for a "donation" was a euphemism—"a pretty common term on *Craigslist* [used by] prostitutes asking for money." Record at 229.

[6] PE 2 at 2.

[7] *Id.*

me know your legit and not a cop. I'll motion you to follow me. I
hope you don't think this is to weird I'm just really paranoid.[8]

After agreeing to meet at a specific time, the appellant again went to the park. The email correspondence continued while the appellant drove around looking for Taylor. Detective Y, an undercover, civilian police officer who apprehended the appellant, watched the appellant search the park for "over forty-five minutes."[9] After the appellant began to drive away from the area, Detective Y arrested him and recovered condoms, lubrication, flowers, an ice chest, a Marshall's gift card, and $7.00 in cash from the appellant's car.

## B. Member voir dire and challenge for cause

In group voir dire, Lieutenant (LT) G indicated he could keep an open mind about the accused's guilt or innocence until all evidence had been presented, agreed he would be satisfied having his own guilt or innocence and sentence determined by a court member having his own present state of mind, indicated he would be able to listen to explicit sexual testimony, did not feel unable to sit as a member in the court-martial, and could follow all instructions given by the military judge.

During LT G's individual voir dire, he explained that he knew two of his family members were sexually assaulted as children, and that he had previously served on a court-martial panel that convicted and adjudged 45 years of confinement for a Sailor who sexually assaulted his own teenaged stepdaughter.

LT G's father-in-law once told LT G that "child sexual assault [happened] to him" and other relatives of his generation decades earlier, but the conversation involved essentially no further details.[10] LT G later had a conversation with his wife that he simply described as in the nature of "'your dad mentioned this, and now I know.'"[11] LT G informed the military judge that this family history would have no effect on his ability to serve as a fair and impartial member in this case.

Around the age of seven, LT G's cousin, decades younger than LT G, was sexually assaulted by a neighbor who was an older child. That abuse occurred for a couple of years, and no charges were ever filed. LT G said—"with conviction" according to the military judge's contemporaneous observation on the record—that the situation with his cousin would not impact his ability to

---

[8] *Id.* at 4.

[9] Record at 277.

[10] *Id.* at 129.

[11] *Id.* at 130.

be a fair and impartial member in this case because the appellant's alleged offenses and his cousin's situation, which involved "two children," were "completely different" and raised "a completely separate set of issues[.]"[12]

LT G described the earlier court-martial in which he participated as a panel member as "a very disturbing case" and said, "[a] lot of what happened stuck with me[.]"[13] He also admitted "it may have affected me differently if I had daughters."[14] LT G further explained that he does not "think about that case often," but he thinks about it "about twice a year" upon seeing something on the news related to a "parent-child sexual assault type thing[.]"[15] When the military judge asked whether participation in that court-martial would "color[ ] at all [LT G's] ability to be fair and impartial" in the present case, he "pretty quickly and with a lot of conviction" indicated that it would not—as the military judge immediately noted—before discussing why:[16]

> [LT G]: I—well, I thought you were going to ask that question next is why I answered quickly, sir. But they are dramatically different case[s] from what I read in the—in the charge sheet. They're—with the exception of the age—ages of the victim and [the appellant in the other court-martial] and what is stipulated for the—for Taylor Pender in this charge sheet—
>
> MJ: And I'm—I'll just jump on your word choice. Nothing is stipulated in there, right? Those are just allegations, right?
>
> [LT G]: Correct, Sir.
>
> MJ: Okay. Go ahead.
>
> [LT G]: What is . . . written on the charge sheet.
>
> MJ: Okay.
>
> [LT G]: That—that being—that would be the only similarity between the two cases; other than that, they're—they're very vastly different.
>
> MJ: So you're comfortable you can sit and be fair and impartial in this case, based on the little you know about this case at this point?

---

[12] *Id.* at 135.

[13] *Id.* at 131.

[14] *Id.*

[15] *Id.* at 132, 138.

[16] *Id.* at 132.

[LT G]: Yes, Sir.[17]

The military judge denied the appellant's challenge for cause of LT G based upon implied bias.

## II. DISCUSSION

### A. Legal and factual sufficiency

The appellant asserts that his conviction is legally and factually insufficient because the government "failed to prove beyond a reasonable doubt that [he] had the intent to engage in sexual acts *with a minor*[.]"[18] We disagree.

We review questions of legal and factual sufficiency *de novo. United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, any reasonable fact-finder could have found all the essential elements beyond a reasonable doubt." *United States v. Day*, 66 M.J. 172, 173-74 (C.A.A.F. 2008) (citing *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987)). In applying this test, "we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

The test for factual sufficiency is whether, "after weighing all the evidence in the record of trial and recognizing that we did not see or hear the witnesses as did the trial court, this court is convinced of the appellant's guilt beyond a reasonable doubt." *United States v. Rankin*, 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006) (citing *Turner*, 25 M.J. at 325 and Art. 66(c), UCMJ), *aff'd on other grounds*, 64 M.J. 348 (C.A.A.F. 2007). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399. While this is a high standard, the phrase "beyond a reasonable doubt" does not imply that the evidence must be free from conflict. *Rankin*, 63 M.J. at 557 (citation omitted).

To convict the appellant of the consolidated attempt specification, the government had to prove:

> One, that on or about 24 September 2014, at or near Mount Vernon, Washington, the appellant did a certain act, that is, travel to Hillcrest Park after communicating indecent language

---

[17] *Id.* at 132-33.

[18] Appellant's Brief of 17 Feb 2016 at 16.

via electronic means to Detective L, an undercover law enforcement officer whom the appellant believed to be Taylor Pender, a child under the age of sixteen years;

Two, that he did the act with the specific intent to commit the offense of sexual assault of a child by exchanging cash and a Marshall's gift card for the performance of sexual acts with Detective L, an undercover law enforcement officer whom he believed to be Taylor Pender, a child under the age of sixteen years;

Three, that the act amounted to more than mere preparation, that is, it was a substantial step and a direct movement toward the commission of the intended offense; and

Four, that the act apparently tended to bring about the commission of the offense of sexual assault of a child under the age of sixteen, that is, the act apparently would have resulted in the actual commission of the sexual assault of a child except for a circumstance unknown to the accused which prevented completion of that offense.

Record at 318-20; MANUAL FOR COURTS-MARTIAL (MCM), UNITED STATES (2012 ed.), Part IV, ¶ 4b; Appellate Exhibit (AE) XXIX.

The appellant concedes that "he negotiated a price for sexual acts" before "dr[iving] to the location where [he and Taylor] were supposed to meet" while he "possessed several items related to sexual intercourse."[19] But he contends he "never had the intent to engage in sexual acts with a minor," insisting that, "[w]hen he traveled to the park that day, his intent was to first verify that the woman he had spoken with online was of age" before he "continued on to engage in sexual activity."[20]

He further argues that reasonable doubt about his guilt arises from his communications with Taylor: his *Craigslist* ad's explicitly "sought a woman at least 18 years old"; his overt response—"'You look like you must be 18. Your 18 right?'"—to receiving a photograph of Taylor demonstrated he did not believe her claim of being fourteen; and there were "conflicting messages about [Taylor's] age," such as her "taking courses online," "need[ing] money to pay her bills, and [her ability to] purchase alcohol and get into bars."[21]

---

[19] *Id.* at 18.

[20] *Id.* at 15.

[21] *Id.* at 20.

Our assessment of the evidence differs from the appellant's. Although she responded to an advertisement for adults, Taylor quickly, and very clearly, informed the appellant that she was 14—which Detective L described at trial as a comment which ended responses from the vast majority of those she encountered during her online operations. Taylor later reiterated she was 14, and not 18, in response to the appellant's comments about her photograph. Taylor's comments to the appellant about living with her mom, being home-schooled, buying alcohol and getting into bars only because people did not know she was underage, asking the appellant to bring her a wine cooler to help her cope with her sexual inexperience were also consistent with comments by an apparent 14-year-old.

Rather than a desire to confirm whether or not Taylor was a minor, the "expressed . . . concern for confirming [her] identity and proving she was the person she made herself out to be"[22] reflects only the appellant's effort to guard against his obvious, and very different fear—that Taylor might actually be an undercover police officer.

Weighing all the evidence presented at trial, and making allowances for not having personally observed the witnesses, we are persuaded, beyond reasonable doubt, that the appellant indeed believed Detective L's online persona, Taylor, was 14 years old when he took a substantial step towards having sex with her. The government proved his specific intent to commit sexual acts with a minor, and he is guilty of the Article 80, UCMJ, offense.

## B. Member challenged for cause

The appellant contends LT G should have been excused for cause based on the theory that "most people would believe . . . he likely would be prejudiced by his past experiences."[23]

RULE FOR COURTS-MARTIAL (R.C.M.) 912(f)(1), MCM, UNITED STATES (2012 ed.), states a "member shall be excused for cause whenever it appears that the member . . . [s]hould not sit . . . in the interest of having the court-martial free from substantial doubt as to legality, fairness, and impartiality." This rule "encompasses both" demonstrations of "actual bias and implied bias." *United States v. Warden*, 51 M.J. 78, 81 (C.A.A.F. 1999) (citation and internal quotation marks omitted). "A military judge's determinations on the issue of member bias, actual or implied, are based on the totality of the circumstances particular to [a] case." *United States v. Nash*, 71 M.J. 83, 88 (C.A.A.F. 2012) (citations and internal quotation marks omitted) (alteration

---

[22] *Id.*

[23] *Id.* at 30.

in original). "The burden of establishing that grounds for a challenge exist is upon the party making the challenge." R.C.M. 912(f)(3).

In our review, we consider whether each member for whom the appellant's challenge for cause was denied—and on whom no peremptory challenge was exercised—demonstrated either actual or implied bias. *See United States v. Armstrong*, 54 M.J. 51, 53 (C.A.A.F. 2000) (holding that because "[a]ctual bias and implied bias are separate legal tests, not separate grounds for challenge," we are "not constrained by the plain-error doctrine," even where "defense counsel did not . . . specifically articulate a challenge" at trial on a theory of actual or implied bias).

Actual bias exists when a member's bias "is such that it will not yield to the evidence presented and the judge's instructions." *United States v. Napoleon*, 46 M.J. 279, 283 (C.A.A.F. 1997) (citation and internal quotation marks omitted). "Actual bias is reviewed subjectively, through the eyes of the military judge or the court members." *Warden*, 51 M.J. at 81 (citations and internal quotation marks omitted). When grounds for challenge were properly asserted at trial, a military judge's decision to deny a challenge for cause for actual bias is reviewed for an abuse of discretion. *United States v. Leonard*, 63 M.J. 398, 402 (C.A.A.F. 2006). The abuse of discretion standard calls for more than a mere difference of opinion; the challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous. *United States v. Baker*, 70 M.J. 283, 287 (C.A.A.F. 2011). A military judge receives latitude on his factual determinations of actual bias because he personally observed the member's demeanor. *Leonard*, 63 M.J. at 402.

"[I]mplied bias is viewed through the eyes of the public[,]" focusing "on the perception or appearance of fairness of the military justice system." *Warden*, 51 M.J. at 81 (citations and internal quotation marks omitted). Implied bias exists "when most people in the same position [as the challenged member] would be prejudiced." *Id.* (citations and internal quotation marks omitted). A military judge's decision to grant or deny an implied bias challenge for cause is reviewed with less deference than abuse of discretion, but more than *de novo* review. *United States v. Bagstad*, 68 M.J. 460, 462 (C.A.A.F. 2010). "[I]nstances in which the military judge's exercise of discretion will be reversed will indeed be rare" when he "considers a challenge based on implied bias, recognizes his duty to liberally grant defense challenges, and places his reasoning on the record[.]" *United States v. Clay*, 64 M.J. 274, 277 (C.A.A.F. 2007). However, less deference is given when the military judge's implied bias analysis is not comprehensive. *Id.* at 278. "In cases where less deference is accorded," our "analysis logically moves more towards a *de novo* standard of review." *United States v. Rogers*, 75 M.J. 270, 273 (C.A.A.F. 2016).

Although noting how the military judge here correctly "recited the test for implied bias and discussed the liberal grant mandate," the appellant avers "the military judge failed to apply [them] appropriately" in analyzing the defense's implied bias challenge for cause against LT G.[24]

The military judge placed on the record his reasoning for denying the challenge. First, the military judge found that LT G's "father-in-law is kind of a red herring," because "it happened 60 years ago, and [LT G] kind of heard about it, and that's the extent of his knowledge about that" since it was "not an issue within the family."[25] Second, LT G's prior service as a court-martial member was in a case that involved "a stepdaughter, and it was actual assault."[26] The military judge reiterated that LT G "doesn't even think about it now," except "when he hears about a case like in the news or something, [and] he says 'oh, yeah, I sat on a jury about a case like that[.]"[27] Further, LT G "did not indicate any lingering emotional issues," as evidenced by "his affect[,] he wasn't giving the standard answers that he knew he was supposed to give, so to speak[.]"[28] The military judge observed that LT G's "answers were quick and deliberate," and "without any hesitation."[29] Third, the

---

[24] *Id.* at 27. The military judge articulated his understanding of the law before either party challenged a member:

> R.C.M. 912 encompasses challenges based on both actual bias and implied bias, even if counsel don't specifically use those terms.
>
> The test for actual bias is whether the member's bias will not yield to the evidence presented and the judge's instructions. The existence of actual bias is a question of fact; accordingly, I must determine whether it is present in a prospective member.
>
> Implied bias exists when, despite a credible disclaimer, most people in the same position as the court member would be prejudiced. In determining whether implied bias is present, I look to the totality of the circumstances. Implied bias is viewed objectively through the eyes of the public. Implied bias exists if an objective observer would have substantial doubt about the fairness of the accused's court-martial panel.
>
> In close cases, military judges are enjoined to liberally grant defense challenges for cause. This liberal-grant mandate, however, does not apply to government challenges for cause.

Record at 181.

[25] *Id.* at 185.

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] *Id.*

military judge explained the abuse suffered by LT G's cousin, "wasn't some kind of a festering family secret, a family issue that everyone is spun up about and concerned about[,]" because LT G "didn't give that impression at all."[30] LT G instead "indicated specifically," and "without hesitation," that "he could vote not guilty with a clean conscience."[31] The military judge concluded that "while absolutely judges are enjoined to grant liberally defense challenges for cause in close cases, this is not a close case, and that challenge is denied."[32]

The military judge's ruling primarily discussed how LT G subjectively was not biased, thereby completing an actual bias analysis. We find no abuse of discretion with regard to the military judge's not excusing LT G for actual bias and specifically concur that LT G was unequivocal in his statements of impartiality and ability to follow the military judge's instructions on the law. But we more fully address whether LT G's experience created an implied bias requiring excusal by specifically addressing whether a member of the public would perceive LT G's participation in this court-martial as unfair in light of his family history and previous court-martial member experience.

"[A] member is not *per se* disqualified because [the member] or a close relative has been a victim of a similar crime." *United States v. Daulton*, 45 M.J. 212, 217 (C.A.A.F. 1996) (citations omitted).[33] Although the *Daulton* court found implied bias where two of the challenged member's *immediate* family members had been sexually abused, one was "approximately the same age as the [alleged] victims" and the member's "responses to the military judge's questions" of whether "she could separate her family's experience from appellant's case" were "painfully honest but less than resounding." 45 M.J. at 217-18. In *United States v. Terry*, 64 M.J. 295 (C.A.A.F. 2007), a panel member's participation in a rape trial did not create implied bias, despite that member's spouse having been sexually assaulted "at least ten, and perhaps as many as twenty years" before the court-martial—the court specifically noted that the sexual assault "was never reported to law enforcement, nor was it cause for [the spouse] to receive any counseling[,]"

---

[30] *Id.* at 185-86.

[31] *Id.* at 185.

[32] *Id.* at 186.

[33] *See, e.g. United States v. Chappell-Denzer*, No. ACM 38498, 2015 CCA LEXIS 234, at *9-10, unpublished op. (A.F. Ct. Crim. App. 5 Jun 2015) (finding no implied bias where a member's sibling "was the victim of an assault that occurred 17 years ago," as "they had not discussed the incident for about 15 years"), *rev. denied*, 75 M.J. 60 (C.A.A.F. 2015).

and that member and his spouse "had spoken about the event only a few times" and "not . . . for at least five years." 64 M.J. at 296, 299, 304.[34]

Neither does service in a previous court-martial, in which an accused was convicted, *per se* disqualify a member from participation in a later court-martial for similar offenses. *See United States v. McDonald*, 57 M.J. 747, 748, 751 (N-M. Ct. Crim. App. 2002), *rev'd on other grounds*, 59 M.J. 426 (C.A.A.F. 2004) (finding no implied bias from a member's participation in McDonald's court-martial for sexual conduct towards a child, even though the member had served as the bailiff for a prior court-martial of a different chief petty officer for sexual harassment).

We find that LT G's specific level of exposure to, and personal impact from, his two non-immediate family members' instances of childhood sexual abuse and serving as a member in the previous court-martial would not prevent most people in LT G's situation from sitting impartially in this case. The totality of the circumstances in this analysis includes LT G's noted affect during voir dire, the timing of the abuse of his family members, the specific relatively low levels of family and personal trauma LT G recounted about the three previous scenarios, and the factual distinctions between the acts of abuse against his family members and the victim in the previous court-martial, as compared to the appellant's alleged offenses. We find that the fully-informed public would not doubt the fairness of LT G remaining on the appellant's court-martial panel.

## C. Sentence appropriateness

The appellant argues that five years' confinement is inappropriately severe and "does not reflect [his] character nor the nature of the crimes for which he was convicted."[35]

We review the record for sentence appropriateness *de novo. United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006). "Sentence appropriateness involves the judicial function of assuring that justice is done and that the accused gets the punishment he deserves." *United States v. Healy*, 26 M.J. 394, 395 (C.M.A. 1988). This requires "individualized consideration of the particular accused on the basis of the nature and seriousness of the offense and the character of the offender." *United States v. Snelling*, 14 M.J. 267, 268 (C.M.A. 1982)

---

[34] *Cf. Terry*, 64 M.J. at 304-05 (finding implied bias from the participation of another member who also personally knew two rape victims because of that member's relationship with one of the crimes—against his "longstanding" romantic partner whom he had planned to marry until she ended their relationship over the rape, and later named the child that resulted from the rape after the member despite ultimately pushing the member out of her life).

[35] Appellant's Brief at 31.

(citation and internal quotation marks omitted). "While [a Court of Criminal Appeals] clearly has the authority to disapprove part or all of the sentence and findings," we may not engage in acts of clemency. *United States v. Nerad*, 69 M.J. 138, 145 (C.A.A.F. 2010).

The appellant's convictions triggered a mandatory dishonorable discharge and his maximum punishment included potential confinement for 20 years. With individualized consideration of the appellant, the nature and seriousness of his offenses, his commendable 18-year record of service before the offense, and all the matters within the record of trial, we find that his adjudged sentence is appropriate under these circumstances.

## D. CMO error

The appellant correctly identifies the CMO's failure to reflect that the military judge, after findings, conditionally dismissed Specification 1 and merged it with Specification 2. We review error in CMOs under a harmless error standard. *United States v. Crumpley*, 49 M.J. 538, 539 (N-M. Ct. Crim. App. 1998). The appellant has not asserted, and we do not find, that this error materially prejudiced his substantial rights. However, as he is entitled to accurate court-martial records, *id.,* we order corrective action in the decretal paragraph.

## III. CONCLUSION

The findings and sentence as approved by the convening authority are affirmed. The supplemental CMO will reflect that the military judge conditionally dismissed Specification 1, and then consolidated Specifications 1 and 2 into a single specification for findings and sentence,[36] to read as follows:

> In that Chief Aviation Electronics Technician Matthew R. Beltran, U.S. Navy, Fleet Readiness Center Northwest, Oak Harbor Washington, on active duty, did, at or near Mount Vernon, Washington, on or about 24 September 2014, attempt to commit sexual acts upon a child who had attained the age of 12 years but had not attained the age of 16 years, to wit: Chief Beltran travelled to Hillcrest Park in Mount Vernon, Washington to exchange cash and a Marshall's gift card for the performance of sexual acts with Detective Theresa L, an undercover law enforcement officer whom Chief Beltran believed to be Taylor Pender, a child under the age of 16 years,

---

[36] Record at 388-89.

and with whom he had previously communicated indecent language via electronic means.[37]

Judge GLASER-ALLEN and Judge HUTCHISON concur.

For the Court



R.H. TROIDL
Clerk of Court

---

[37] AE XXIX.