# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
MULLIGAN, FEBBO, and WOLFE
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Sergeant LOUIS R. QUILL**
**United States Army, Appellant**

ARMY 20160454

Headquarters, Fort Carson
Lanny Acosta, Jr., Military Judge
Colonel Gregg A. Engler, Staff Judge Advocate

For Appellant: Matthew Flynn, Esquire (argued); Daniel Conway, Esquire; Captain Matthew D. Bernstein, JA (on brief).

For Appellee: Captain Meredith M. Picard, JA (argued); Colonel Tania M. Martin, JA; Major Michael E. Korte, JA; Captain Meredith M. Picard, JA (on brief).

10 August 2018

---------------------------------
MEMORANDUM OPINION
---------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

FEBBO, Judge:

This case is before us for review pursuant to Article 66, Uniform Code of Military Justice (UCMJ), 10 U.S.C. 866.[1] Appellant raises three assignments of error; we will address all. First, whether the military judge erred in admitting appellant's confession under Military Rule of Evidence (Mil. R. Evid.) 304(c).

---

[1] A panel of officers sitting as a general court-martial convicted appellant, contrary to his pleas, of one specification of sexual assault, in violation of Article 120, UCMJ. Relevant to the issues on appeal, the specification alleged appellant sexually assaulted Private (PV2) LW by "penetrating her vulva with his penis and fingers without her consent." The panel sentenced appellant to a dishonorable discharge, confinement for 30 months, and reduction to the grade of E-1. The military judge granted appellant 180 days of confinement credit. The convening authority approved the adjudged sentence.

Second, whether the military judge erred by denying a defense challenge of a panel member for cause. Third, appellant challenges the legal and factual sufficiency of his conviction.

We conclude the military judge erred by applying the wrong law to rule on the admission of appellant's confession, but the error was harmless because application of the correct law also results in the admission of appellant's confession. We next conclude the military judge did not abuse his discretion allowing the challenged panel member to sit on appellant's case. We further conclude the evidence is legally and factually sufficient to convict appellant for much the same reasons we conclude appellant's confession was properly corroborated. When appellant's confession is considered together with the evidence corroborating it, there is overwhelming evidence of appellant's guilt.

## BACKGROUND

On 8 March 2015, appellant was a noncommissioned officer (NCO) assigned to Fort Carson. Private (PV2) LW had recently graduated from Army Initial Training (AIT) and had been assigned to Fort Carson for four days. The events that led to appellant sexually assaulting PV2 LW while she was passed-out drunk in appellant's barracks room started at a barrack's cookout. The testimony of different witnesses was fairly consistent until the point PV2 LW's friends left her alone and unconscious in appellant's room and appellant locked his door behind them.

### A. A Dangerous Cocktail: NCOs, Privates, and Alcohol

After the barracks cookout party, appellant invited PV2 LW, her boyfriend who was also a PV2 at the time, and two other privates, PV2 Kelsch and PV2 Meyers,[2] to his barracks room to play beer pong. The four junior soldiers were close friends with each other, but they had just met appellant that evening. Other than a few words, PV2 LW did not speak or interact with appellant. During the cookout, PV2 LW drank various alcoholic beverages. She became drunk. Appellant, PV2 LW's boyfriend, and PV2 Kelsch were also drinking alcohol.

Later that evening, while appellant and the three privates played beer pong and smoked, PV2 LW fell asleep on appellant's bed. Still later in the evening, appellant asked the three privates to go get cigarettes. He gave them money. Private Meyers drove with PV2 LW's boyfriend and PV2 Kelsch to get cigarettes at the local shopette. When they left, the three Privates saw PV2 LW was fully clothed and sleeping on the bed. Before leaving, PV2 LW's boyfriend made sure that his

---

[2] This opinion refers to all parties by their names and ranks at the time of the assault. Private LW later married the man who was then her boyfriend.

girlfriend was alright, that the barrack's door was propped open by the deadbolt, and the lights were on.

Upon arriving at the shopette, the trio realized it was already closed and they were unable to go inside to buy cigarettes. They were only gone for a total of around 10-15 minutes before they arrived back at appellant's room.

### B. What Happened Behind the Locked Door

As they testified at trial, when PV2 Kelsch, PV2 Meyers, and PV2 LW's boyfriend arrived back at appellant's room, the door was shut, locked, and the lights were off. The trio knocked on the door and began to kick the door and yell when appellant did not initially open it. It took several minutes for appellant to open the door.

Appellant answered the door in his boxers, with a noticeably erect penis. The three privates saw PV2 LW was still passed-out on the bed. She was now under a blanket. Private Kelsch went to wake PV2 LW so they could all leave. As he attempted to wake her, PV2 Kelsch noticed that she had been stripped naked from the waist down. Her pants and underwear were pulled down with only one foot in her pants, and her shirt was pushed up to under her breast. Private Kelsch testified that PV2 LW was unconscious and mumbling when he began helping her get dressed. After PV2 Meyers finished getting PV2 LW dressed, PV2 LW began to vomit. Correctly assessing what happened in his absence, PV2 LW's boyfriend confronted appellant. When asked by PV2 LW's boyfriend, appellant claimed he did not know why PV2 LW's clothes were off. Fisticuffs ensued between appellant and PV2 LW's boyfriend. Private Meyers carried PV2 LW out of the room. The three privates took PV2 LW to the charge of quarters (CQ) office. The Military Police were called.

### C. The CID Investigation

A CID Special Agent interviewed PV2 LW. At the time, she did not think she was sexually assaulted. She did not have any vaginal pain the next day and, as she testified at trial, she could not remember anything between when the group was playing beer pong until she was in the CQ office. Private LW initially declined a medical exam, but shortly afterward agreed to undergo a Sexual Assault Forensic Examination (SAFE). During the SAFE, samples were collected for DNA testing.

CID also collected appellant's clothing for DNA testing. CID interviewed appellant several times. After initial denials of misconduct, appellant provided a sworn statement to CID essentially confessing to sexually assaulting PV2 LW. This was the statement that appellant sought to exclude at trial.

In the sworn statement, appellant explained that he locked the barracks door after the three privates left. He did not know PV2 LW's name and he knew she was intoxicated and passed out on the bed. After taking off his shirt and pants, he turned off the lights. Appellant laid on the bed and started "fondling" PV2 LW's breast and "touching her body." Appellant admitted that PV2 LW "was too intoxicated to consent to any type of sexual activity that night." He described her state of consciousness as "kinda in and out." He took off her pants without her consent and she did not help remove them. After removing her pants, appellant went through the "steps" that he "normally" took "with someone and not hearing no."[3] Appellant started to "message her vagina" and inserted his "right index finger" in her vagina. Appellant reported that he "was under the impression that she hadn't said no yet so [he] stuck [his] penis in her vagina." After "a few minutes," he heard banging on the door and "realized [he] wasn't doing the right thing at the time." Appellant explained he was drunk.

After DNA testing by U.S. Army Criminal Investigation Laboratory (USACIL), PV2 LW's DNA was detected on the inside of appellant's underwear in the area of the crotch. Appellant's DNA, however, was not detected on the inside or outside of PV2 LW's genitalia.

### D. Objection to the Confession at Trial

At trial, after PV2 LW, her boyfriend, PV2 Kelsch, PV2 Meyers, and the USACIL DNA expert testified, appellant moved to exclude appellant's statement to CID. Appellant's counsel argued that the statement contained uncorroborated admissions or confessions. In particular, appellant argued that the "inference of actual penetration" was not corroborated. Appellant argued that there was an absence of appellant's DNA in or around PV2 LW's genitalia. Appellant also argued that DNA of PV2 LW's boyfriend was recovered from PV2 LW during the SAFE, but no DNA from PV2 LW's boyfriend was found on appellant or his underwear. Appellant claims that if he had committed penetrative sexual acts with PV2 LW, her boyfriend's DNA, being already present, would have transferred onto appellant and then onto his underwear. He further argues that PV2 LW's DNA could have been transferred into his underwear by means other than sexual intercourse.

The DNA examiner explained that she could not "say for certain" how PV2 LW's DNA was deposited inside appellant's underwear. The examiner also

---

[3] The appellant's statement suggests that the absence of protest is the same as affirmative consent. This view is both legally and factually wrong. The absence of "no" is simply not the same as an affirmative "yes."

4

explained that it was possible for DNA to be present on an object, like appellant's underwear, but go undetected by testing.[4]

After argument and a recess, the military judge made the following findings of fact:

> [T]here exists a statement from the accused in which he admits to having sexual intercourse with the alleged victim and inserting his fingers into her vagina . . . . [T]here exists evidence that – of DNA of the alleged victim found on the inside of the accused's boxer shorts.
>
> The alleged victim was seen fully dressed lying on the bed of the accused prior to the departure of three witnesses.  Upon return the three witnesses reported finding the alleged victim in a state of undress, nude from the waist down, and covered in a blanket. These three same witnesses also witnessed the defendant in a state of dress wearing boxer shorts upon their return.
>
> There's testimony that the DNA could've been placed on the inside of the boxer shorts through several different means.
>
> . . . .
>
> [D]espite the defense argument to the contrary, the testimony of the expert did not exclude that penetration occurred as stated in the accused's statement.

The military judge concluded that "physical evidence and the expert testimony coupled with the evidence as to access, opportunity, time, and location and method of the offense provide more than sufficient corroboration to the statement of the accused."  The military judge denied the defense motion and ruled that appellant's confession was corroborated and admissible.

---

[4] In other words, the weight a fact finder might give to the *presence* of DNA is not necessarily the same as the weight a fact finder might give to the *absence* of DNA.

## LAW AND DISCUSSION

### A. Corroboration of a Confession Under Mil. R. Evid. 304(c)

Appellant argues the military judge erred by admitting his confession to the charged offense despite—appellant claims—a lack of evidence corroborating his confession. In particular, appellant asserts there was no evidence in the record to corroborate the essential fact of penetration by appellant's penis or his fingers into PV2 LW's vagina.

### 1. Standard of Review for the Military Judge's Ruling

We review a military judge's admission of evidence for an abuse of discretion. *United States v. Adams*, 74 M.J. 137, 139 (C.A.A.F. 2015) (citing *United States v. McCollum*, 58 M.J. 323, 335 (C.A.A.F. 2003)). "A military judge abuses his discretion if his findings of fact are clearly erroneous or his conclusions of law are incorrect." *United States v. Olson*, 74 M.J. 132, 134 (C.A.A.F. 2015) (internal quotation omitted). "A military judge abuses his discretion if his ruling is influenced by an erroneous view of the law." *United States v. Matthews*, 53 M.J. 465, 470 (C.A.A.F. 2000) (internal quotation omitted).

The parties agree that because the appellant was arraigned on 1 March 2016, the Military Rules of Evidence as they existed on that date apply to appellant's court martial.[5] It appears, however, that the military judge relied, at least in part, upon the version of Mil. R. Evid. 304(c) that took effect on 20 May 2016. At trial, the parties based their arguments on *Adams* and other cases predating the new Mil. R. Evid. 304(c). Since the military judge stated that the new rule did not explicitly overturn

---

[5] On May 15, 2013, the President signed Executive Order 13643, which updated the Military Rules of Evidence in their entirety. Exec. Order 13643, 78 Fed. Reg. 98, 29559 (May 21, 2013). Military Rule of Evidence 304(c) was again revised in 2016 by removing the requirement that all "essential facts" of a confession or admission be individually corroborated. Instead, the 2016 rule requires only that the confession or admission be corroborated by "evidence that would tend to establish the trustworthiness of the admission or confession" as a whole. Exec. Order 13730, 81 Fed. Reg. 102, 33350 20 May 2016. The rule change did not apply to appellant's case because he was arraigned before the 20 May 2016 effective date for the new rule. The significance of the date of arraignment to the rules effective at a court-martial is a long-standing principle that should be familiar to military justice practitioners. *See, e.g. United States v. Merritt*, 1 C.M.R. 56, 15-18 (C.M.A. 1951). This effective date, and the significance thereof, was also plain on the face of the executive order implementing the rules that the military judge erroneously applied in this case. Exec. Order 13730, 81 Fed. Reg. 102, 33331.

*Adams*,[6] the military judge and the parties discussed *Adams* and the analysis thereof. For example, consistent with *Adams*, the military judge stated the essential facts he considered included time, place, opportunity, access, and method. Portions of the military judge's conclusions of law, however, refer to the language of the 2016 version of the rule rather than the 2013 version. For example, the military judge relied on language in the new rule requiring corroboration by "evidence that would tend to establish the trustworthiness of the admission."[7]

The military judge's findings of fact were not clearly erroneous. His conclusions of law are, however, at least partly based on the wrong version of Mil. R. Evid 304(c). It is an abuse of discretion to apply the wrong law. We therefore conclude the military judge abused his discretion by applying the wrong version of Mil. R. Evid. 304(c). Because we find the military judge abused his discretion by applying the wrong law, we must further determine whether his error prejudiced appellant. *United States v. Robinson*, 58 M.J. 429, 433 (C.A.A.F. 2003). If a military judge reaches the right result for the wrong reason, the military judge's error is harmless because application of the correct law would not change the outcome. *Id.* Therefore, we will review the military judge's decision to admit the confession de novo under the rules in effect at the time of appellant's arraignment. *See United States v. Cannon*, 74 M.J. 746, 751 (Army Ct. Crim. App. 2015).

### 2. *Application of the Corroboration Rule in Effect During Appellant's Trial*

The applicable version of Mil. R. Evid 304(c)(1) reads:

> An admission or a confession of the accused may be considered as evidence against the accused on the question of guilt or innocence only if independent evidence, either direct or circumstantial, has been admitted into evidence that corroborates the essential facts admitted to justify sufficiently an inference of their truth.

Mil. R. Evid. 304(c)(1) (15 May 2013).

Interpreting the applicable language of Mil. R. Evid. 304(c)(1), the Court of Appeals for the Armed Forces has explained: "What constitutes an essential fact of an admission or confession necessarily varies by case. Essential facts we have

---

[6] Plainly, however, the current version of Mil. R. Evid. 304(c)(1) dispenses with the requirement that each "essential fact" of an admission or confession be corroborated.

[7] The language from the military judge's ruling mirrors the new version of Mil. R. Evid. 304(c)(1) almost verbatim.

previously considered include the time, place, persons involved, access, opportunity, method, and motive of the crime." *Adams*, 74 M.J. at 140. Our superior court further explained:

> There is no 'tipping point' of corroboration which would allow admission of the entire confession if a certain percentage of essential facts are found to be corroborated. For instance, if four of five essential facts were corroborated, the entire confession is not admissible. Only the four corroborated facts are admissible and the military judge is required to excise the uncorroborated essential fact.

*Id.*

Under *Adams*, while every essential fact must be independently corroborated, every essential fact need not be independently proved beyond a reasonable doubt, or even by a preponderance of the evidence. "Rather, the corroborating evidence must raise only an inference of truth as to the essential facts admitted." *Id.* (quoting *United States v. Cottrill*, 45 M.J. 485, 489 (C.A.A.F. 1997) (the independent evidence "need not [establish reliability] beyond a reasonable doubt or by a preponderance of the evidence."). Our superior court has recently reiterated that, "only a small quantum of evidence is needed to corroborate an essential fact in a confession or admission." *United States v. Jones*, __ M.J. __, slip op. at 6 (C.A.A.F. 31 Jul. 2018).

### 3. Applying the Corroboration Requirement to the Facts of this Case

The facts in *Adams* are distinguishable from the evidence presented for corroboration of appellant's confession. In *Adams*, the alleged robbery victim did not testify and "the only direct evidence of the crime was the confession." *Id.* at 141. Also absent from trial was evidence to corroborate Adams' opportunity or motive to commit the crime, access, or his intent. Unlike *Adams*, appellant's confession was corroborated by three witnesses who testified to the actual events immediately before and after the sexual assault. Independent evidence was presented to corroborate the time, place, persons involved, access, opportunity, method, and motive of the crime. The government also presented DNA evidence to corroborate appellant's confession.

In order to corroborate the appellant's confession, the government did not have to disprove every alternate theory for the presence or absence of DNA evidence. Nor, unlike the overall burden of proof at trial, did the government need to prove each essential fact stated in appellant's confession beyond a reasonable doubt—or even by a preponderance of the evidence. *Adams* requires building blocks

of evidence, not a finished wall of proof. The independent evidence "need raise only an inference of the truth of essential facts admitted." Mil. R. Evid. 304(c)(4) (15 May 2013). This inference of truth "may be drawn from a quantum of corroborating evidence that [our superior court] has described as 'very slight.'" *United States v. Arnold*, 61 M.J. 254, 257 (C.A.A.F. 2005) (quoting *United States v. Melvin*, 26 M.J. 145, 146 (C.M.A. 1988)). The quantum of corroborating evidence in appellant's case exceeded the "very slight" corroboration required.

Three witnesses agree they left PV2 LW fully clothed and passed-out in appellant's room. The lights were on and the door was bolted to remain open. When the trio returned early from trying to purchase cigarettes, the lights were off and door was locked. After the witnesses pounded on the door for an extended time, yelling and kicking, appellant opened the door in his underwear with a visible erection. Immediately thereafter the witnesses found PV2 LW, still passed-out, with her clothes stripped off her. In our view, these facts alone sufficiently corroborated appellant's admission to the penetrative acts.

Additionally, however, PV2 LW's shirt was pushed up to under her breasts corroborating appellant's statement that he abused her breasts. Private LW was nude from the waist down, corroborating appellant's statement that he "messaged," "fingered" and "stuck [his] penis in her vagina." Private LW's DNA was found inside appellant's underwear, which also corroborated the sexual assault, and particularly appellant's penile penetration of PV2 LW's vagina. Although appellant speculates on alternative explanations for the presence of PV2 LW's DNA in his underwear, "[t]he evidence needed to corroborate an admission need not foreclose all other reasonable possibilities." *United States v. Gable*, 2015 CCA LEXIS 501, at *14 (A.F. Ct. Crim. App. 5 Nov. 2015) (forensic testimony that an intoxicated victim's DNA was detected on appellant's bed sheets was sufficient to justify an inference of truth of the admission to sexual intercourse).

Our review of the record convinces us that appellant's confession was corroborated and admissible under the version of Mil. R. Evid 304(c)(1) that was in effect at the time of his arraignment and *Adams*. The military judge reached the right result, albeit for the wrong reason. Because application of the correct law reaches the same outcome as that reached by the military judge, the military judge's error was harmless. *See Robinson*, 58 M.J. at 433-34.

### B. Challenge of a Panel Member for Cause

Appellant asserts the military judge erred by denying appellant's challenge of a panel member, Major (MAJ) SD, for cause under an implied bias theory, because MAJ SD's sister was the victim of a sexual assault. We find the military judge did not err.

### 1. The Standard of Review and Doctrine of Implied Bias

Implied bias exists if inclusion of a panel member would cause a reasonable member of the public to doubt the fairness of the court-martial. *United States v. Rogers*, 75 M.J. 270, 272-73 (C.A.A.F. 2016). Implied bias, much like actual bias, is cause for challenge, to remove a biased member from the panel that will hear the case. "[C]hallenges for cause are to be liberally granted." *United States v. Glenn*, 25 M.J. 278 (C.M.A. 1987) (citations omitted).

"[The] standard of review on a challenge for cause premised on implied bias is less deferential than abuse of discretion, but more deferential than de novo review." *United States v. Bagstad*, 68 M.J. 460, 462 (C.A.A.F. 2010) (internal quotation marks and citations omitted). Under this standard, "[w]e do not expect record dissertations but, rather, a clear signal that the military judge applied the right law." *United States v. Downing*, 56 M.J. 419, 422 (C.A.A.F. 2002). Indeed, "where the military judge places on the record his analysis and application of the law to the facts, deference is surely warranted." *Id*. Further, where a military judge has addressed implied bias by applying the liberal grant mandate on the record, that military judge will accordingly be granted "more deference on review than one that does not*." United States v. Clay*, 64 M.J. 247, 277 (C.A.A.F. 2007).

Implied bias is reviewed under an objective standard, "viewed through the eyes of the public, focusing on the appearance of fairness." *United States v. Briggs*, 64 M.J. 285, 286 (C.A.A.F. 2007). "Implied bias exists when, 'regardless of an individual member's disclaimer of bias, most people in the same position would be prejudiced [that is, biased].'" *Id*. (alteration in original) (quoting *United States v. Napolitano*, 53 M.J. 162, 167 (C.A.A.F. 2000)). "[M]ere declarations of impartiality, no matter how sincere, may not be sufficient." *United States v. Nash*, 71 M.J. 83, 89 (C.A.A.F. 2012); *cf. United States v. Torres*, 128 F.3d 38, 47 (2d Cir. 1997) ("Once facts are elicited that permit a finding of inferable bias, then, just as in the situation of implied bias, the juror's statements as to his or her ability to be impartial become irrelevant.").

### 2. The Panel Member's Voir Dire

Group voir dire was extensive and included over one hundred questions from the military judge and counsel. During group voir dire, in response to the defense counsel's questions, MAJ SD agreed that someone could falsely confess to a crime they did not commit, not all allegations of sexual assault are truthful, false accusations of sexual assault occur, and he knew someone that had been falsely accused of rape or sexual assault.

Major SD also stated he knew someone that had been sexually assaulted. During individual voir dire, MAJ SD explained the person in question was his sister. He thought the assault happened "about 2012" but was unsure of the exact year and

indicated it could have been as distant as 2010. He did not know many details about the allegations. Major SD stated he did not know if the assault was in a dormitory or a residence. He stated that his sister knew her assailant, campus security was called, and he believed alcohol was involved. Major SD was not aware of any criminal proceedings in the case. He reported no particular feelings about the lack of any legal resolution. Major SD considered the assault a "closed chapter" in his sister's life. Major SD explained that his sister is twelve years his junior, and he was not close to his sister. He explained they "don't really keep in very close contact," speaking only "once in a while," and she did not call him for advice. Major SD stated that he believed his sister was twenty-three years of age at the time of appellant's trial.

Also during individual voir dire, MAJ SD informed the parties that around 2014 or 2015 he had had conducted his own self-study regarding sexual assault in the military. Major SD explained his self-study was not academically rigorous, and consisted of "just reading up on various articles and books."

Although the military judge granted defense challenges to four other panel members in MAJ SD's venire, he denied the defense challenge to MAJ SD.

### 3. Applying the Implied Bias Test to the Facts of this Case

Appellant challenged MAJ SD for cause. Defense counsel argued that his sister was sexually assaulted four years prior to appellant's trial, and that his sister was roughly the same age as PV2 LW, and the alleged incident involved alcohol.[8] Appellant argues that MAJ SD's answers to the military judge about whether he could set aside his feeling about his sister's assault were equivocal. Appellant also claims that MAJ SD's reading about sexual assault in the military should have disqualified him from sitting as a panel member in appellant's case.

According to appellant, the facts of MAJ SD's sister's assault "mirror" the facts of this case. We disagree. Unfortunately, many sexual assault allegations involve young adults and alcohol, and that is the extent of the similarity between what MAJ SD reported and the facts of this case. Major SD was only aware of general information relating to his sister's assault. There was no suggestion that MAJ SD's sister was unconscious, or left alone with a relative stranger. Indeed, one of the few facts MAJ SD knew about his sister's assault was that she knew her

---

[8] Additionally, the defense counsel argued that MAJ SD's sister was assaulted at a college dormitory, similar to the barracks. This argument was contrary to the actual statement of MAJ SD, who, when asked by the defense counsel if the assault happened in a dormitory responded: "I don't know if it was in a dorm or residence of some sort."

assailant. Indeed, other than the fact it was a sexual assault of a young adult in which alcohol was in some way involved, there is little similarity between what we know about the assault of MAJ SD's sister and the appellant's case. Moreover, MAJ SD did not express anything that would suggest learning of his sister's assault was a pronounced and distinct experience for him, or otherwise affected him in a way that would bias his service on appellant's panel. *Cf. United States v. Terry*, 64 M.J. 295, 297 (C.A.A.F. 2007) (a military judge erred in not granting a challenge for cause against a panel member with a "pronounced and distinct" experience with a crime similar to that alleged at trial).

The military judge denied the for-cause challenge of MAJ SD, and placed his analysis on the record as follows:

> I've considered the challenge for cause based on both actual and liberal—actual and implied bias and the mandate to liberally grant the defense challenge, the challenge is denied for the following reasons: First of all, the defense—he did not state that his self-study was related to his sister and it was not tied to that. He specifically stated that it was not tied to that. In his initial response he stated it was related to military sexual assault and wanting to know more about that at the time of his initial responses. He appeared to not have any particular knowledge about the incidence [sic] that occurred, other than it occurred on campus for his sister and that alcohol was involved.

> He stated he is not close to his sister, that he does not have—that there's a twelve years difference between the two, and they talk very infrequently. The court did not find his answers to be equivocal and the court found his answer to be, as to whether or not he could set it aside, and to able to set that incident aside, that it was a closed chapter in his life, and that he could—that it would play no role in his duties as a member of the panel to hear this case in a fair and impartial manner. That it had no role in that whatsoever. So for that reason the challenge is denied.

Like the conclusion of the military judge, our review of the record does not disclose any actual bias in MAJ SD.

In his ruling rejecting the implied bias challenge, the military judge included his analysis and plainly stated the liberal grant mandate as part of his decision. As

such, we give more deference to his ruling than if he had failed to do so. Affording the military judge the deference due, we hold he did not err in finding no implied bias in MAJ SD.

The military judge specifically found that MAJ SD's answers were not equivocal. We likewise find MAJ SD's answers were not equivocal. In the context of the questions and answers, MAJ SD's use of the words "I believe so," and "I think so," about setting aside any feeling about his sister's sexual assault were responsive to the questions asked. The military judge followed-up with additional questions to confirm MAJ SD's responses were not equivocal. Major SD explained he could actually set aside any feelings and decide the case in a fair and impartial manner.

"A prior connection to a crime similar to the one being tried before the court-martial is not per se disqualifying to a member's service." *Terry*, 64 M.J. at 297; *See also United States v. Daulton*, 45 M.J. 212, 217 (C.A.A.F. 1996) (a member is not per se disqualified because [the member] or a close relative has been a victim of a similar crime.) However, if a member's experience with a crime similar to the one being tried is "pronounced and distinct," the military judge should grant the challenge for cause. *Terry*, 64 M.J. at 297. Our superior court has also explained: "the critical question under military law has been whether a member possessed an inflexible or biased attitude as a result of being the victim of a similar crime." *United States v. Reichardt*, 28 M.J. 113, 116 (C.A.A.F. 1989) (citations omitted).

MAJ SD's experience with sexual assault was not pronounced and distinct, and he did not have an inflexible or biased attitude. He was not emotionally close to his sister, he was twelve years older than she, and he spoke to her infrequently. Major SD did not have detailed knowledge of his sister's assault. He did not know whether it took place in a dormitory or a residence, and he was not even certain of the year in which it happened.

Major SD's reading on sexual assault in the military was not related to his sister's assault, and nothing suggested the reading would bias MAJ SD one way or another. Major SD agreed that false allegations of sexual assault occur and he even knew someone that was falsely accused of sexual assault.

Unlike, actual bias, implied bias does not relate the subjective sincerity of a panel member's statements, but rather how a member of the general public would objectively perceive the panel member's statements. We conclude an objective member of the public would not question MAJ SD's objectivity or the fairness of the proceedings based on MAJ SD's service as a member of the panel. The military judge did not err in his denial of the challenge for cause.

### C. Legal and Factual Sufficiency

Appellant asserts that the government failed to prove PV2 LW did not consent to sexual intercourse. In the alternative, appellant argues that he had a reasonable mistake of fact as to her consent.[9] In appellant's confession, he stated that PV2 LW "moaned" and "was moving around" when he "fondled" her breasts. Appellant also observes that PV2 LW did not testify "that she resisted or told the appellant no."[10]

For the reasons explained in section "A," above, and based on the totality of the record, we are ourselves convinced, beyond a reasonable doubt, of the appellant's guilt. Appellant did not have any prior relationship with PV2 LW and did not even know her name when he was entrusted with watching over her while she was passed-out in his barracks room.

Evidence at trial established that PV2 LW was intoxicated and utterly incapable of consent. Appellant himself believed she was "too intoxicated to consent to any type of sexual activity." Appellant admitted she was asleep when he got onto the bed that she did not say anything prior to the sexual acts. Instead, she "just mumbled" and spoke "no describable words." According to appellant, rather than getting consent, he went "through the steps that [he] normally take[s] with someone and not hearing no." Appellant himself explained that PV2 LW "hadn't said no yet so [he] stuck [his] penis in her vagina." Of course, PV2 LW hadn't said "no" yet because she was incapable of doing so while passed-out drunk. When PV2 LW's friends pounded on the door, appellant knew he "was doing something wrong."

Based on the entire record, therefore, we find both the findings and sentence are correct in law and fact, and should be approved.

## CONCLUSION

Upon consideration of the entire record, the findings of guilty and sentence are AFFIRMED.

Senior Judge MULLIGAN concurs.

---

[9] The military judge gave the panel a mistake of fact instruction.

[10] Of course, this is unsurprising considering there was overwhelming evidence PV2 LW was passed-out drunk at the time of the assault, and presumably was incapable of even expressing her non-consent.

Judge Wolfe, concurring:

I concur fully with today's opinion for the reasons stated by Judge Febbo. However, three additional matters also pull me towards this result.

First, I conclude that as the military judge explained in detail his reasoning in overruling the defense challenge to MAJ SD, his decision is entitled to additional deference. *United States v. Woods*, 74 M.J. 238, 243 n.1 (C.A.A.F. 2015). This court has described this as a "sliding scale of deference." *United States v. Mayo*, ARMY 20140901, 2017 CCA LEXIS 239, at *9 (Army Ct. Crim. App. 7 Apr. 2017).

Second, and relatedly, I interpret our superior court's recent decisions as specifically allowing a military judge to consider a panel member's demeanor when ruling on an implied bias challenge. *Woods*, 74 M.J. at 243 n.1 ("resolving claims of implied bias involves questions of fact *and demeanor*, not just law." (emphasis added)).[11]   We have previously concluded that "an implied bias analysis is viewed through the eyes of a member of the public *watching the proceedings*." *United States v. Hines*, 75 M.J. 734, 740 n.5 (Army Ct. Crim. App. 2016) (emphasis in original).  That is, the objective member of the public is not reading a cold transcript, but also has the same information (including demeanor evidence) as the trial judge.  *Id*.  Accordingly, since the record contains the military judge's specific finding that Major SD's answers to key questions were unequivocal, in a case where the cold transcript could have been read differently, this too weighs in favor of giving the military judge deference.

Third, I note this case does not involve allegations of unlawful command influence, or concerns about military directed training, duties, or command emphasis related or connected to military justice or sexual assault. *See United States v. Peters*, 74 M.J. 31, 34 (C.A.A.F. 2015) (the basis for the implied bias challenge "stems from historic concerns about the real and perceived potential for command influence in courts-martial.") (internal quotation marks omitted).  In this regard, this case is distinguishable from *Woods* (Panel member believed that military members were guilty until proved innocent); *United States v. Rogers*, 75 M.J. 270 (C.A.A.F. 2016) (Panel member stated Coast Guard training was that someone who could not remember giving consent was too drunk to consent); and *United States v. Commisso*, 76 M.J. 315 (C.A.A.F. 2017) (three panel members previously sat on sexual assault review board of same case).

---

[11] *But see United States v. Peters*, 74 M.J. 31, 34 (C.A.A.F. 2015) ("Whereas a military judge can observe the demeanor of the court members in order to determine credibility in the case of actual bias, cases of implied bias are based upon an objective test and therefore the military judge is given less deference in such cases.").

QUILL—ARMY 20160454



FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court