# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
SALUSSOLIA, SCHASBERGER, and EWING
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Specialist BRIAN K. HOLLENBECK**
**United States Army, Appellant**

ARMY 20170237

Headquarters, United States Army Africa/Southern European Task
Joseph A. Keeler, Military Judge
Colonel Louis P. Yob, Staff Judge Advocate

For Appellant:  Captain Benjamin A. Accinelli (argued); Lieutenant Colonel Tiffany M. Chapman, JA; Major Brendan R. Cronin, JA; Captain Benjamin A. Accinelli (on brief);

For Appellee:  Captain Brian Jones (argued); Colonel Steven P. Haight, JA; Major Virginia Tinsley, JA; Captain Brian Jones, JA (on brief).

27 June 2019

----------------------------------
MEMORANDUM OPINION
----------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

EWING, Judge:

During appellant's sexual assault trial, a panel member asked nine questions of various witnesses using permutations of the term "sexual predator."  No one else used this term at trial.  Appellant challenged the panel member for cause, contending, *inter alia*, that the member's questions improperly assumed appellant's guilt prior to the close of evidence.  In denying appellant's challenge, the military judge did not voir dire the panel member, did not provide any curative instructions, and did not consider the liberal grant mandate.  In light of the nature of the member's questions, and following our superior court's guidance in *United States v. Nash*, 71 M.J. 83 (C.A.A.F. 2012), and *United States v. Clay*, 64 M.J. 274 (C.A.A.F. 2007), we find that the military judge abused his discretion in denying appellant's challenge for cause.

**BACKGROUND**[1]

*The Trial*

The government charged appellant with committing a variety of unlawful sexual acts upon his mother-in-law, MF.[2]  In part, the government alleged that appellant performed sexual acts on MF when she was asleep, to include inserting his penis into her mouth and ejaculating.  The charged conduct occurred while MF was visiting appellant and his wife at their apartment in Vicenza, Italy.

The resulting trial was hotly contested.  The parties presented countervailing evidence and theories, which included detailed testimony from expert witnesses over the potential effects of MF's prescription medications.  The government's theory was that appellant repeatedly assaulted MF in her sleep while she was heavily sedated by her medications, and the defense countered that MF's medications caused her to hallucinate assaults that did not occur.

Prior to trial on the merits, the military judge instructed the panel that "until [the members] have heard all the evidence and received the instructions, it is vitally [important] that [they] keep an open mind throughout the trial until all the evidence has been presented and the instructions have been given."  The military judge similarly told the panel that they "must keep an open mind throughout the trial," and "must impartially hear the evidence, the instructions on the law, and only when [they] were in their] closed-session deliberations may [they] properly make a determination as to whether the accused is guilty or not guilty."  The military judge also instructed the panel that they could ask questions to witnesses, but could not "attempt to help either the government or the defense."

MF testified about the alleged assaults, including the incident where she woke up to find semen in her mouth and appellant standing off to her side.  MF spit the semen onto her pillowcase, which she locked into her suitcase, brought home, and gave to law enforcement.

---

[1] A panel with enlisted representation sitting as a general court-martial convicted appellant, contrary to his pleas, of one specification of sexual assault, in violation of Article 120, Uniform Code of Military Justice, 10 U.S.C. § 920 [UCMJ].  The panel acquitted appellant of one specification of abusive sexual contact and one specification of indecent exposure, in violation of Articles 120 and 120c, UCMJ.  The panel sentenced appellant to a dishonorable discharge and confinement for 42 months.  The convening authority approved the sentence as adjudged.

[2] At the time of the alleged offenses, appellant was 20 years old and his mother-in-law was 42.

DNA testing revealed appellant's semen on the pillowcase. A government expert psychiatrist explained that MF's prescription medications would have caused her to be heavily sedated during her sleep. Several government witnesses, including multiple family members, testified about how and when MF reported the assaults.

During the defense case, appellant's wife, HH, provided an alternate explanation for appellant's semen being found on the pillowcase. HH claimed that she and appellant had consensual sexual intercourse numerous times in numerous positions—to include using the pillow itself—and she outlined several possibilities for how his semen could have gotten onto the pillowcase. Additionally, HH testified that she did not wash the pillowcase prior to MF's visit, and she did not think MF washed it after her arrival.

The defense also presented expert testimony from Lieutenant Colonel (LTC) (Dr.) NH, who was a forensic psychiatrist with extensive education and training in prescription medications, medication management, pharmacology, and chemistry. LTC NH, who explained that he had a particular professional interest in drug interactions, and had put significant study into the issue, testified that he would not have been comfortable prescribing the drug cocktail that MF was taking in Italy, and that the drugs, both separately and in combination, could cause "hallucinations," "vivid dreams," and "hypersexuality."

*Major SW's Questions*

The panel members at appellant's trial asked numerous questions of the witnesses. The member at issue in this appeal, Major (MAJ) SW, personally asked approximately 40 questions of seven different witnesses. The military judge sustained defense objections to some of MAJ SW's questions, asked modified versions of some of the questions, and asked some of the questions verbatim. Nine of MAJ SW's questions incorporated the term "sexual predator" in some way. Most germane here, MAJ SW posed the following seven questions, written on a single sheet of paper to LTC NH, the defense's expert psychiatrist witness:

1. Do you have any background in treating or identifying sexual pred[a]tors?

2. Can you define the term ["]grooming["] in terms of sexual pred[a]tors?

3. Are sexual pred[a]tors often people we know?

4. Do sexual pred[a]tors look normal?

5. How common is it for a sexual [predator] to [choose] family members as their victims?

6.  Is it possible that the accused (SPC Hollenbeck) groomed his mother-in-law by first "accidentally" touching her breasts, then moving on to exposing himself, and later sexual assault?

7.  Once a sexual predator assaults a victim, how likely is it that a sexual predator would assault the same victim or someone else again?

The defense objected to all seven of these questions, and indicated in their written objections that, among other things, the questions were "guilt assuming." The military judge sustained the defense's objections and did not ask the questions.

In a separate question also posed to LTC NH, MAJ SW asked whether, in LTC NH's "professional opinion," MF's drug use was "something that a sexual predator will look for in [choosing] his or her victim(s) because they can be used to discredit a victim."[3] The military judge sustained the defense's objection to this question.

*The Defense Challenge of MAJ SW and the Military Judge's Ruling*

In an Article 39(a) session following the parties' closing arguments but before the government's rebuttal argument, the defense challenged MAJ SW for cause and requested individual voir dire.[4] Specifically, trial defense counsel contended that

---

[3] In addition to these questions, MAJ SW also asked the government's expert psychiatrist whether, because of MF's prescription drugs, it would have been "easy for a sexual pred[a]tor to prey on her in her medicated state," and whether the impact of MF's medications was "something that a sexual pred[a]tor would rely on to discredit the victim." Appellant objected to these questions, in part as "commenting on the ultimate issue of guilt." The military judge asked the first of these two questions, after sua sponte editing out "sexual predator" and inserting "someone." The military judge sustained the defense's objection to the second of the two questions. The government objected to none of MAJ SW's nine "sexual predator" questions.

[4] There is some ambiguity in the record as to whether trial defense counsel: (1) requested individual voir dire, or (2) requested individual voir dire and then withdrew that request. At oral argument, appellant contended that his trial defense counsel had requested individual voir dire if the military judge did not otherwise believe that his challenge of MAJ SW was meritorious on its face. Upon our review of the record, we agree with appellant's interpretation. We note that government counsel at trial apparently did as well, as he specifically opposed individual voir

(continued . . .)

4

MAJ SW's demeanor during trial, and specifically during the defense's closing argument, coupled with her "sexual predator" questions which "assumed the guilt on behalf of . . . the accused," indicated that she had "already formed an opinion" on appellant's guilt. Trial counsel opposed both the challenge for cause and the request for individual voir dire.

The military judge denied appellant's challenge of MAJ SW, and explained, in toto, as follows:

> The court has looked at the members throughout the trial. I have not seen anything out of the ordinary from the member that the defense is talking about. She has been—I have not seen any subtle facial expressions and when the questions were objected to, when I told—said on the record that I would not read those questions that—there was no disappointment, there was simple acceptance. I do not see any part of facial expression or with the questions that she has made up her mind as to the guilt or innocence of the accused. So I'm denying the defense motion to challenge [MAJ SW] for cause.

## LAW AND DISCUSSION

*Law and Standard of Review*

An accused has a "constitutional right, as well as a regulatory right, to a fair and impartial panel." *United States v. Commisso*, 76 M.J. 315, 321 (C.A.A.F. 2017) (citations omitted). "Indeed, impartial court-members are a sine qua non for a fair court-martial." *Id.*; *see also, e.g., McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984) (the impartial trier of fact is a "touchstone of a fair trial").

Rule for Courts-Martial (R.C.M.) 912 provides for the challenge of panel members and "encompasses challenges based upon both actual and implied bias." *United States v. Elfayoumi*, 66 M.J. 354, 356 (C.A.A.F. 2008) (citations omitted). Specifically, R.C.M. 912(f)(1)(M) requires excusal of a panel member who has "formed or expressed a definite opinion as to the guilt or innocence of the accused as to any offense charged," – e.g., "actual bias" – and R.C.M. 912(f)(1)(N) requires excusal of a member when the member "[s]hould not sit as a member in the interest

---

(. . . continued)
dire of MAJ SW. There is no dispute that appellant challenged MAJ SW for cause; at that point, the military judge had the discretion to conduct voir dire of the member.

of having the court-martial free from substantial doubt as to legality, fairness, and impartiality," that is, "implied bias."

Military judges uphold the accused's right to an impartial panel through the application of the actual and implied bias standards. *Nash*, 71 M.J. at 88. Actual and implied bias claims are examined based on the "totality of the circumstances particular to [a] case." *Id.* (citing *United States v. Terry*, 64 M.J. 295, 302 (C.A.A.F. 2007)) (quoting, in turn, *United States v. Strand*, 59 M.J. 455, 456 (C.A.A.F. 2004)) (alteration in original). Actual bias and implied bias are "separate legal tests, not separate grounds for a challenge." *Id.* (quoting *United States v. Armstrong*, 54 M.J. 51, 53 (C.A.A.F. 2000)).

"Actual bias is a personal bias that will not yield to the military judge's instructions and the evidence presented at trial." *Id.* (citation omitted). The concept of "implied bias" stems from the "historic concerns about the real and perceived potential for command influence" in courts-martial. *United States v. Dockery*, 76 M.J. 91, 96 (C.A.A.F. 2017) (quoting *Clay*, 64 M.J. at 276-77). Implied bias exists if a reasonable member of the public would doubt the fairness of a court-martial because of a panel member's participation in the case. *United States v. Peters*, 74 M.J. 31, 36 (C.A.A.F. 2015). Implied bias is "evaluated objectively under the totality of the circumstances and through the eyes of the public, reviewing the perception or appearance of fairness of the military justice system." *Dockery*, 76 M.J. at 96 (quoting *Clay*, 64 M.J. at 277) (quoting, in turn, *United States v. Townsend*, 65 M.J. 460, 463 (C.A.A.F. 2008)) (internal quotation marks omitted).

While issues of actual and implied bias often arise during pretrial voir dire, "[a] party may challenge a member for cause 'during trial when it becomes apparent that a ground for challenge may exist.'" *United States v. McFadden*, 74 M.J. 87, 90 (C.A.A.F. 2015) (quoting R.C.M. 912(f)(2)(B)); *see also Nash*, 71 M.J. at 88 (panel member challenge during defense case).

Undergirding military judges' rulings on panel member challenges is the "liberal grant mandate," which "has been recognized since the promulgation of the Manual for Courts–Martial" in 1951, and is "part of the fabric of military law." *Clay*, 64 M.J. at 277 (citations omitted); *see also Manual for Courts-Martial* (*MCM*), Analysis of Rules for Courts-Martial, app. 21 at A21-62 (noting that while the liberal grant mandate is no longer in the RCMs, its "deletion [was] not intended to change the [liberal grant] policy"). The liberal grant mandate means that "in close cases military judges are enjoined to liberally grant challenges for cause" raised by the defense. *Clay*, 64 M.J. at 277.

Appellate courts review a military judge's actual bias rulings for an abuse of discretion, *United States v. Woods*, 74 M.J. 238, 243 (C.A.A.F. 2015), and implied bias rulings on an intermediate "less deferential than abuse of discretion, but more deferential than de novo" standard of review. *United States v. Rogers*, 75 M.J. 270,

273 (C.A.A.F. 2016) (citations omitted). Appellate courts will overturn a military judge's ruling where the judge "clearly abuses his discretion in applying the liberal grant mandate" in a "close case." *Clay*, 64 M.J. at 277-78 (citations omitted).

*United States v. Nash*

Our superior court's decision in *Nash* is instructive and largely guides our resolution of this case. *Nash* was a contested general court-martial before a panel with enlisted representation and involved allegations of child sexual acts and child pornography. 71 M.J. at 84. During the government's case in *Nash*, the panel heard testimony from two separate child sex victims, and learned of nearly 600 images and/or videos of child pornography that Naval Criminal Investigative Services (NCIS) found in Nash's quarters. *Id*. at 85.

During Nash's defense case, with Nash's wife on the stand, one of the panel members, Master Gunnery Sergeant (MGySgt) S, requested that the military judge ask the following question: "Do you think a pedophile can be rehabilitated?" *Id*. Both parties objected to the question, and the military judge did not ask it. *Id*. Nash's trial defense counsel then requested individual voir dire of MGySgt S, to determine whether the member "still maintained an open mind." *Id*.

Realizing the import of the question, the military judge first provided a curative instruction to the entire panel, reminding them of his pre-trial admonition that they "must keep open minds regarding the verdict until all the evidence is in and [the panel had] been instructed as to the law." *Id*. All panel members, including MGySgt S, indicated that they could follow this instruction. *Id*. Later, before deliberations, the military judge followed up with individual voir dire of MGySgt S. *Id*. at 86. During that individual voir dire, MGySgt S again indicated that he had not prematurely decided the case, and was not presuming that Nash was a pedophile with his question. *Id*. Nash's trial defense counsel challenged MGySgt S for cause. *Id*.

The military judge in *Nash* found no actual bias, based on MGySgt S's responses in individual voir dire. *Id*. at 87. While the Navy-Marine Corps Court of Criminal Appeals (NMCCA) found no actual bias, but found implied bias, the Court of Appeals for the Armed Forces (CAAF) found that MGySgt S's question was evidence of *actual* bias. Specifically, the CAAF held that the question "suggested that MGySgt S believed [Nash] was a pedophile that committed the crimes he was charged with and that [the member] might have believed pedophiles cannot be rehabilitated, and did so before the close of the evidence." *Id*. at 89. The CAAF further found that neither the military judge's curative instructions to the panel as a whole, nor his individual voir dire of MGySgt S, "resolv[ed] the question of bias." *Id*. As such, the CAAF held that the military judge abused his discretion in finding that MGySgt S was not actually biased. *Id*. at 89-90.

*Whether the Military Judge Abused His Discretion in Appellant's Case*

In short, MAJ SW's questions, coupled with the fact that the military judge did not conduct voir dire or consider the liberal grant mandate, mandates reversal in this case in light of *Nash*.

As in *Nash*, here, MAJ SW's most problematic questions came during the defense case, or before the "close of evidence." 71 M.J. at 89.[5]  Neither LTC NH, nor any other witness at appellant's trial, used the term "sexual predator" during testimony.  Rather, LTC NH's testimony dealt nearly exclusively with the interactions of the six different prescription drugs that MF was taking while she was in Italy visiting the Hollenbecks.  Major SW posed seven questions to LTC NH on one sheet of paper, in the nature of non-sequiturs referring to "sexual predators," in the immediate wake of LTC NH's obviously highly favorable defense testimony that MF could have been "hallucinating," having "vivid dreams," or suffering from "hypersexuality."

One of MAJ SW's questions is particularly analogous to the *Nash* question. Specifically, MAJ SW's proposed question of whether "[o]nce a *sexual predator* assaults a victim, how likely is it that a sexual predator would assault the same victim *or someone else again*?" invokes the same twin problems of guilt-assumption and potential lack of rehabilitative potential as the *Nash* pedophile question. (emphasis added).  That is to say, MAJ SW's question "suggested that [MAJ SW] believed [appellant] was a [sexual predator] that committed the crimes he was charged with and that [she] might have believed [sexual predators] cannot be rehabilitated, and did so before the close of evidence." *Id*. at 89.

Furthermore, the government only charged appellant with assaulting one person, MF.  As such, and like the question in *Nash*, the words "or someone else again" clearly refer to potential future dangerousness and rehabilitation.  Even worse than the question in *Nash*, however, this question also clearly exceeded the scope of the charge sheet in appellant's case.

---

[5] The issue of "bias" once a panel member has sat through the government's case-in-chief was thus squarely at issue in *Nash*, as it is here, based on the similar timing of the problematic questions in the two cases (although, in this case, MAJ SW also asked questions using the term "sexual predator" during the *government's* case). While it is human nature for panel members to begin forming opinions based on evidence and testimony properly admitted during trial, *Nash* makes clear that members must keep an open mind until they have heard all of the evidence, to include any evidence presented by the defense.  71 M.J. at 89.  Any attempt to draw this line anywhere else during a trial quickly becomes unworkable, and carries with it a high risk of unfairness to the defense.

Moreover, unlike the single problematic question in *Nash*, there is additional evidence here of MAJ SW's actual bias. First, as to the issue of whether MAJ SW was referring to "sexual predators" generally, or to appellant specifically, on a single sheet of paper she used the term in five consecutive questions, then named appellant by name in a sixth question, then used "sexual predator" in a seventh question. Second, the most natural reading of at least two of MAJ SW's questions to LTC NH ("Are sexual pred[a]tors often people we know?", and "Do sexual pred[a]tors look normal?") is that they were rhetorical in nature, as opposed to genuine questions that sought to tap the expertise of LTC NH.

To the extent MAJ SW's actual bias at all remained an open question following her series of questions to LTC NH, the military judge's failure to conduct individual voir dire renders that question unanswerable. As in *Nash*, where the CAAF found that the military judge's individual voir dire of MGySgt S "did not relieve the concern that MGySgt S had made up his mind because he did not state a clear rationale for asking the question," 71 M.J. at 89, likewise here MAJ SW stated no rationale at all for her questions, because she was not asked. *See also McDonough Power Equip., Inc.*, 464 U.S. at 554 (noting importance of voir dire for "exposing possible biases, both known and unknown, on the part of potential jurors"). We review the record we have, not the record that we could have had.

Finally, the record is devoid of any evidence that the military judge considered the liberal grant mandate in denying defense's challenge of MAJ SW. While we hold that MAJ SW's questions were evidence of actual bias, as in *Nash*, the issue was at least "close" under any view of the member's questions. *Clay*, 64 M.J. at 278. Particularly in the absence of voir dire or even so much as a mention of the liberal grant mandate, we cannot find that the military judge properly applied the liberal grant mandate to the defense's challenge to MAJ SW.

At oral argument, the government conceded that the military judge did not apply the liberal grant mandate to the defense's challenge of MAJ SW, but contended (for the first time) that the liberal grant mandate does not apply to mid-trial challenges for cause. The government offered no authority to support this proposition, and our superior court has held otherwise. *See, e.g., United States v. Mosqueda*, 43 M.J. 491, 493-94 (C.A.A.F. 1996) (holding that a military judge abused his discretion by failing to apply the liberal grant mandate to a mid-trial challenge for cause).

To be clear, we do not find the military judge abused his discretion in ruling on the demeanor exhibited by MAJ SW during the court-martial. *See, e.g., Woods*, 74 M.J. at 243. Instead, like *Nash*, our ruling is based on the nature of MAJ SW's questions themselves, coupled with the additional considerations that the military judge did not conduct individual voir dire or apply the liberal grant mandate.

In reaching this decision, we seek to provide two additional points of clarity. First, we reach our decision in this case in light of the fact that appellant, as in *Nash*, challenged the relevant panel member for cause. The CAAF has held that, where there is no challenge for cause of a panel member, military judges "*may*, in the interest of justice, excuse a member against whom a challenge for cause would lie." *United States v. McFadden*, 74 M.J. 87, 90 (C.A.A.F. 2015) (quoting R.C.M. 912(f)(4)) (emphasis in original). As such, "[a] military judge has the discretionary authority to sua sponte excuse the member but *has no duty to do so*." *McFadden*, 74 M.J. at 90 (citations omitted) (emphasis added); *see also United States v. Akbar*, 74 M.J. 364, 395 (C.A.A.F. 2015); *United States v. Campbell*, ARMY 20160215, 2018 CCA LEXIS 547 (Army Ct. Crim. App. 20 Nov. 2018) (summ. disp.). Excusing a member sua sponte is a "drastic action" which must be supported by the record. *McFadden*, 74 M.J. at 90 (quoting *United States v. Velez*, 48 M.J. 220, 225 (C.A.A.F. 1998)).

Second, nothing in this opinion should be construed to chill panel member questioning of witnesses, which is their right in the military justice system, and which is an important part of the trial process. There is a broad continuum of potential panel member questions, from completely innocuous questions on one end, to self-evidently problematic questions on the other. The applicable questions in this case, like *Nash*, fall squarely into the latter category.

With such questions, a military judge's role reaches beyond merely ruling on whether the proposed questions may technically be asked of the witness. Rather, the military judge's role in cases like this is a more "holistic one," which asks "whether 'the overall questioning . . . creates an impression or a substantial doubt that [the panel member] had departed from [their] required character as . . . unbiased member[s] of the court.'" *United States v. Hill*, 45 M.J. 245, 249 (C.A.A.F. 1996) (quoting *United States v. Lamela*, 7 M.J. 277, 279 (C.M.A. 1979)).[6]

In sum, while we recognize that military judges have no duty to sua sponte excuse a member, we cannot over-emphasize the importance to both judges and military justice practitioners of proactively identifying and addressing potential issues of panel member bias in a comprehensive fashion. These issues do not end with assembly of the court, but rather continue throughout the trial.

---

[6] *Hill* itself stands as a useful counterpoint to *Nash*. In *Hill*, one panel member asked over 50 questions, and the panel as a whole asked 125. 45 M.J. at 247. But because none of the member's questions demonstrated that they had "prematurely jump[ed] to de facto deliberations," *id*. at 248, the CAAF held that the military judge did not abuse her discretion by denying the mid-trial challenge for cause in that case. *Id*. at 249-50.

## CONCLUSION

The findings of guilty and sentence are SET ASIDE. A rehearing may be ordered by the same or a different convening authority.[7]

Senior Judge SALUSSOLIA and Judge SCHASBERGER concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

---

[7] In light of our conclusion, we need not address the spousal communications issue personally raised by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). We have also reviewed appellant's briefed assertion of post-trial delay, and we find it does not warrant any further discussion or additional relief.